IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ACPRODUCTS, INC., ACPI WOOD PRODUCTS, LLC, CABINETWORKS GROUP MICHIGAN, LLC, CABINETWORKS GROUP MIDDLEFIELD, LLC, MASTER WOODCRAFT CABINETRY L.L.C., AND SMART, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, | Court Nos. 24-00155, - 00156 |

DEFENDANT'S RESPONSE TO PLANTIFF'S
RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL

HEATHER HOLMAN
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
United States Department of Commerce

MARGARET J. JANTZEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20004
Telephone: (202) 353-7994
E-mail: Margaret.j.jantzen@usdoj.gov

June 6, 2025

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

STATEMENT PURSUANT TO RULE 56.2 ...................................................................... 2

     I.    Administrative Determination Under Review ................................................. 2

     II.    Issues Presented for Review ............................................................................ 3

STATEMENT OF FACTS ............................................................................................... 3

     I    Antidumping And Countervailing Duty Orders ........................................... 3

     II.    Scope Proceeding ........................................................................................... 4

SUMMARY OF ARGUMENT ........................................................................................ 7

ARGUMENT ................................................................................................................... 8

     I.    Legal Standards .............................................................................................. 8

          A.    Standard For Judicial Review Of Scope Determinations ......................... 8

          B.    Legal Framework For Scope Rulings ...................................................... 8

     II.    Commerce's Initiation Of The Scope Inquiry Is Supported By
          Substantial Evidence…………………………………….………...…………… 9

     III.    Commerce's Determination That Merchandise Described In Scenarios 1, 2
          And 3 Are Within The Scope Of The Orders Is Supported by Substantial
          Evidence ...................................................................................................... 13

          A.    The Plain Language Of The Scope Compels The Conclusion That
               Components Are Within The Scope Of The *Orders* Is Supported By
               Substantial Evidence ............................................................................ 13

          B.    Commerce's Substantial Transformation Analysis Is Supported By
               Substantial Evidence ............................................................................ 15

               1.    Legal Standard for Substantial Transformation Analysis ............ 15

               2.    Commerce's Substantial Transformation Analysis Correctly
                   Applied Controlling Law ...................................................... 17

               3.    Substantial Record Evidence Supports Commerce's Substantial
                   Transformation Analysis ...................................................... 21

i

IV.    Commerce's Certification Regime is Supported by Substantial Evidence and
       In Accordance with Law ...................................................................................27

CONCLUSION ....................................................................................................................29

**TABLE OF AUTHORITIES**

**CASES**                                                                                        **PAGE(S)**

*Advanced Tech & Materials Co. v. United States,*
　35 C.I.T. 1380 (2011)................................................................................16

*Agilent Techs. v. United States,*
　256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017).........................................................26

*Am. Silicon Techs. v. United States,*
　261 F.3d 1371 (Fed. Cir. 2001) ........................................................................8

*Arcelormittal Stainless Belgium N.V. v. United States,*
　694 F.3d 82 (Fed. Cir. 2012) ...........................................................................9

*Asia Wheel Co. v. United States,*
　No. 23-00096, --- F. Supp. 3d ---- 2025 WL 573718 (Ct. Int'l Trade Feb. 21, 2025) .............17

*Bell Supply Co. LLC v. United States,*
　888 F.3d 1222 (Fed. Cir. 2018) ...................................................................passim

*Bell Supply Co., LCC v. United States,*
　348 F.Supp.3d 1281 (Ct. Int'l Trade 2018)............................................................20

*Bell Supply Co., LLC v. United States,*
　393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019)............................................. 17, 18, 21

*Bestfoods v. United States,*
　165 F.3d 1371 (Fed. Cir. 1999) ......................................................................16

*Canadian Solar, Inc. v. United States,*
　918 F.3d 909 (Fed. Cir. 2019) .......................................................................28

*Consol. Edison v. NLRB,*
　305 U.S. 197 (1938)......................................................................................8

*Consolo v. Fed. Me. Comm'n,*
　383 U.S. 607 (1966).....................................................................................19

*Crawfish Processors Alliance v. United States,*
　483 F.3d 1358 (Fed. Cir. 2007) .......................................................................8

*Downhole Pipe & Equip., L.P. v. United States,*
　776 F.3d 1369 (Fed. Cir. 2015) ................................................................18, 24

*E.I. DuPont De Nemours & Co. v. United States*,
   8 F.Supp.2d 854 (Ct. Int'l Trade 1998)...................................................................16

*Fabuwood Cabinetry Corp. v. United* States,
   469 F. Supp. 3d 1373 (Ct. Int'l Trade 2020)..........................................................11

*Fedmet Res. Corp. v. United States*,
   755 F.3d 912 (Fed. Cir. 2014)...............................................................................15

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996)..................................................................................8

*Goldlink Indus. Co. v. United States,*
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)............................................................8

*Greentech Energy Sols., Inc. v. United States*,
   714 F. Supp. 3d 1315 (Ct. Int'l Trade 2024)..........................................................28

*Melamine Chemicals, Inc. v. United States*,
   732 F.2d 924 (Fed. Cir. 1984)................................................................................28

*Mitsubishi Elec. Corp. v. United States*,
   898 F.2d 1577 (Fed. Cir. 1990)..............................................................................28

*OMG, Inc. v. United States*,
   972 F.3d 1358 (Fed. Cir. 2020)..............................................................................15

*Perfectus Aluminum, Inc. v. United States*,
   836 F. Appx 883 (Fed. Cir. 2020) ....................................................................10, 11

*Prosperity Tieh Enter. Co. v. United States*,
   965 F.3d 1320 (Fed. Cir. 2020)..............................................................................17

*Qingdao Sea-Line Trading Co. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014)..............................................................................24

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011)..............................................................................24

*Sanchez v. United States*,
   707 F. Supp. 2d 216 (D.P.R. 2010) ........................................................................12

*Sanchez ex rel. D.R.-S. v. United States*,
   671 F.3d 86 (1st Cir. 2012) ....................................................................................12

*Sango Int'l L.P. v. United States,*
    484 F.3d 1371 (Fed. Cir. 2007) ................................................................8

*Smith-Corona Group v. United States,*
    713 F.2d 1568 (Fed. Cir. 1983) .............................................................28

*SolarWorld Americas, Inc. v. United States,*
    910 F.3d 1216 (Fed. Cir. 2018) .............................................................24

*Suntec Indus. Co. v. United States,*
    857 F.3d 1363 (Fed. Cir. 2017) .......................................................12, 13

*Tak Fat Trading Co. v. United States,*
    396 F.3d 1378 (Fed. Cir. 2005) ................................................................9

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) .................................................................................8

*Vandewater Int'l Inc. v. United States,*
    130 F.4th 981 (Fed. Cir. 2025) ..............................................................15

*Venus Wire Indus. Pvt. Ltd. v. United States,*
    424 F. Supp. 3d 1369 (Ct. Int'l Trade 2019) .........................................27

*Venus Wire Industries Pvt. Ltd. v. United States,*
    471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) .........................................19

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) .............................................................................8

19 U.S.C. § 1677b(c)(1)(B) ......................................................................passim

## REGULATIONS

19 C.F.R. § 351.225 .........................................................................................9

19 C.F.R. § 351.225(a) .....................................................................................8

19 C.F.R. § 351.225(c)(2) .....................................................................9, 11, 12

19 C.F.R. § 351.225(c)(2)(i)(E) .....................................................................12

19 C.F.R. § 351.225(d) .................................................................................8, 9

19 C.F.R. § 351.225(d)(1) .......................................................................10, 11

19 C.F.R. § 351.225(j) ........................................................................................... passim

19 C.F.R. § 351.225(k) (2022) ........................................................................................ 15

19 C.F.R. § 351.225(k)(1) .................................................................................... passim

19 C.F.R. § 351.225(k)(2) ................................................................................................ 9

19 C.F.R. § 351.228 ........................................................................................................ 27

## ADMINISTRATIVE DETERMINATIONS

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Scope Determination, Certification Requirements, and Recission of the Circumvention Inquiries on the Antidumping and Countervailing Duty Orders; Correction*,
  89 Fed. Reg. 84,532 (Dep't of Commerce Oct. 23, 2024) ........................................ 2

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Scope Determination, Certification Requirements, and Recission of the Circumvention Inquiries on the Antidumping and Countervailing Duty Orders; Correction*,
  89 Fed. Reg. 63,404 (Dep't of Commerce Aug. 5, 2024) ........................................ 2

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Scope Determination, Certification Requirements and Recission of Circumvention Inquiries on the Antidumping and Countervailing Duty Orders*,
  89 Fed. Reg. 58,110 (Dep't of Commerce July 17, 2024) ........................................ 2

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
  85 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021) ............................ 14, 15

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
  85 Fed. Reg. 49,472, 49,477 (Dep't of Commerce Aug. 13, 2020) .......................................... 12

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*,
  85 Fed. Reg. 22,126, 22,131-33 (Dep't of Commerce Apr. 21, 2020) ................................ 4, 14

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*,
  85 Fed. Reg. 22,134, 22,135-36 (April 21, 2020) ...................................................... 4

*Aluminum Extrusions From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*,
  84 Fed. Reg. 39, 805 (Aug. 12, 2019) ...................................................................... 27

*Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order,*
  84 Fed. Reg. 29, 164 (June 21, 2019) .....................................................................................27

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ACPRODUCTS, INC., ACPI WOOD PRODUCTS, LLC, CABINETWORKS GROUP MICHIGAN, LLC, CABINETWORKS GROUP MIDDLEFIELD, LLC, MASTER WOODCRAFT CABINETRY L.L.C., AND SMART, LLC, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) |

Court Nos. 24-00155, -00156

**ORDER**

On consideration of plaintiffs' motion for judgment on the administrative record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that the motion is denied; and is further

ORDERED that judgment is entered for the United States.


Dated: _____        _____
    New York, NY                                    JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |
|---|---|
| ACPRODUCTS, INC., ACPI WOOD PRODUCTS, LLC, CABINETWORKS GROUP MICHIGAN, LLC, CABINETWORKS GROUP MIDDLEFIELD, LLC, MASTER WOODCRAFT CABINETRY L.L.C., AND SMART, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Court Nos. 24-00155, -00156 |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| UNITED STATES, | )<br>) |
| Defendant, | )<br>) |

**DEFENDANT'S RESPONSE TO PLANTIFF'S
RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiffs, ACProducts, Inc., *et al*. (collectively, ACP), challenging the Department of Commerce's scope ruling, which found that merchandise meeting certain production scenarios for wooden cabinets and vanities and components produced in China, and combined in Malaysia and Vietnam with wooden cabinet component parts produced in Malaysia and Vietnam, respectively, are Chinese in origin and, thus, covered by the antidumping and countervailing duty orders on wooden cabinets from China. Commerce's determination is supported by substantial evidence and in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's determination and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.     Administrative Determination Under Review

The administrative determination under review is *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Scope Determination, Certification Requirements and Recission of Circumvention Inquiries on the Antidumping and Countervailing Duty Orders*, 89 Fed. Reg. 58,110 (Dep't of Commerce July 17, 2024) (VPR 757; MPR 231)[1], corrected by *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Scope Determination, Certification Requirements, and Recission of the Circumvention Inquiries on the Antidumping and Countervailing Duty Orders; Correction*, 89 Fed. Reg. 63,404 (Dep't of Commerce Aug. 5, 2024) (August Correction); further corrected by *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Scope Determination, Certification Requirements, and Recission of the Circumvention Inquiries on the Antidumping and Countervailing Duty Orders; Correction*, 89 Fed. Reg. 84,532 (Dep't of Commerce Oct. 23, 2024) (October Correction) incorporating Commerce's Memoranda: (1) Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China – Final Scope Ruling on Certain Wooden Cabinets that Are Further

---

[1] "VPR" refers to documents from the public record of the scope inquiry from Vietnam, ECF No's 20-1 & 21-1, Ct. No. 24-156.  "VCR" refers to documents from the confidential record of the scope inquiry from Vietnam, ECF No's 20-2 & 21-2, Ct. No. 24-156. "MPR" refers to documents from the public record of the scope inquiry from Malaysia, ECF No's 20-1 & 21-1, Ct. No. 24-155. "MCR" refers to documents from the confidential record of the scope inquiry from Malaysia, ECF No's 20-2 & 21-2, Ct. No. 24-155.  When citing to the administrative record, we refer to the document numbers instead of appendix page numbers (*e.g.,* Appx00001), because, as of the time of this filing and despite numerous requests, plaintiffs have not yet provided us with a complete table reflecting the assigned Bates-page numbers of the record or a complete compilation of the record with the Bates-number pagination.  *See* Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Sept. 30, 2022).  Once we received the complete appendix, we will file a corrected brief that incorporates citations to appendix page numbers.

Processed in the Socialist Republic of Vietnam (July 10, 2024) (VPR 754; VCR 73); and (2)

Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China –

Final Scope Ruling on Certain Wooden Cabinets that Are Further Processed in Malaysia (July

10, 2024) (MPR 229; MCR 74) (Final Scope Ruling).

## II.    Issues Presented for Review

1.  Whether Commerce's initiation of the scope inquiry was supported by substantial

evidence and in accordance with law.

2.  Whether Commerce's scope ruling that certain wooden cabinets and components

further processed in third countries are within the scope of the orders is supported by substantial

evidence;

3.  Whether Commerce's establishment of a certification requirement to facilitate the

enforcement of this scope ruling is in accordance with law.

## STATEMENT OF FACTS

## I.    Antidumping And Countervailing Duty Orders

The orders describe the products subject to be, in relevant part:

> wooden cabinets and vanities that are for permanent installation (including floor
> mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden
> components thereof. Wooden cabinets and vanities and wooden components are
> made substantially of wood products, including solid wood and engineered wood
> products (including those made from wood particles, fibers, or other wooden
> materials such as plywood, strand board, block board, particle board, or
> fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box
> (which typically includes a top, bottom, sides, back, base blockers, ends/end
> panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a
> frame, door, drawers and/or shelves. Subject merchandise includes wooden
> cabinets and vanities with or without wood veneers, wood, paper or other
> overlays, or laminates, with or without non-wood components or trim such as
> metal, marble, glass, plastic, or other resins, whether or not surface finished or
> unfinished, and whether or not completed.

****

3

*Subject merchandise includes the following wooden component parts of cabinets and vanities*: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

\*\*\*\*

*Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: Trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope product.*

\*\*\*\*

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order,* 85 Fed. Reg. 22,126, 22,131-33 (Dep't of Commerce Apr. 21, 2020) (AD Order); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order,* 85 Fed. Reg. 22,134, 22,135-36 (April 21, 2020) (CVD Order) (emphasis added).

## II.    Scope Proceeding

Domestic petitioner American Kitchen Cabinet Alliance (AKCA) asked Commerce to determine whether imports of wooden cabinets and components produced using components manufactured in China that undergo further processing in Vietnam and Malaysia are covered by the orders.  VPR 1; VCR 1; MPR 1; MCR 1 (collectively, Scope Ruling Application).  Commerce requested more detail from AKCA on which products would be covered by a scope inquiry.  VPR 32; MPR 31.  Petitioner responded, providing greater detail on the types of

4

merchandise for which it was requesting a scope inquiry.  VPR 38; MPR 37.  AKCA also

described four processing scenarios, asking that Commerce determine whether merchandise

processed under them was within the scope of the orders.  The scenarios are:

> **Scenario 1**: A Malaysian company imports finished {wooden cabinets and
> vanities (WCV)} WCV doors, drawer fronts, and frames that are produced in
> China. The Malaysian company produces WCV boxes and drawers in Malaysia.
> The Malaysian company combines the WCV doors, drawer fronts, and frames
> that are produced in China with the WCV boxes and drawers produced in
> Malaysia, resulting in merchandise that still meets the description of the scope of
> the Orders.

> **Scenario 2**: A Malaysian company imports semifinished WCV doors, drawer
> fronts, and frames that are produced in China. The Malaysian company performs
> further processing of these components from China in Malaysia such as trimming,
> cutting, notching, punching, drilling, painting, staining, or other finishing
> processes. The Malaysian company produces WCV boxes and drawers in
> Malaysia.  Finally, the Malaysian company combines the WCV doors, drawer
> fronts, and frames that are produced in China with the WCV boxes and drawers
> produced in Malaysia, resulting in merchandise that still meets the description of
> the scope of the Orders.

> **Scenario 3:** A Malaysian company imports semifinished parts of WCV doors,
> drawer fronts, and frames that are produced in China. The parts of the WCV
> doors, drawer fronts, and frames include the rails, stiles, and panels. The
> Malaysian company performs further processing of these parts from China in
> Malaysia such as trimming, cutting, notching, punching, drilling, painting,
> staining, or other finishing processes, including the assembly of the parts to
> produce fully finished WCV doors, drawer fronts, and frames. The Malaysian
> company produces WCV boxes and drawers in Malaysia. Finally, the Malaysian
> company combines the WCV doors, drawer fronts, and frames that are produced
> in China with the WCV boxes and drawers produced in Malaysia, resulting in
> merchandise that still meets the description of the scope of the Orders.

> **Scenario 4:** A Malaysian company imports finished WCV toe kicks that are
> produced in China. The Malaysian company produces all other WCV components
> necessary for a complete cabinet or vanity in Malaysia. The Malaysian company
> combines the WCV toe kicks produced in China with the WCV components made
> in Malaysia, resulting in merchandise that still meets the description of the scope
> of the Orders.

*Id.* at 5-6.

Commerce found the scope ruling request sufficient and initiated a scope inquiry to examine whether wooden cabinets and components that are further processed in Vietnam and Malaysia, are subject to the orders.  VPR 43; MPR 41 (collectively, Initiation Memoranda). Commerce issued its preliminary scope ruling on March 16, 2023.

Commerce explained that it had analyzed the orders' scope language under 19 C.F.R. § 351.225(k)(1), and performed a substantial transformation analysis under 19 C.F.R. § 351.225(j).  VPR 636; VCR 40; MPR 135; MCR 43 (Preliminary Scope Ruling).  Commerce preliminarily concluded that that Scenario 1 merchandise is subject to the orders and that Scenario 4 merchandise was not within the scope of the orders.  *Id*.  Commerce found insufficient evidence on the record to determine whether Scenario 2 and 3 merchandise was covered by the orders.  *Id.*  Commerce invited interested parties to provide information to allow Commerce to determine whether Scenario 2 and 3 merchandise were subject to the orders.  *Id.* at 51-52.

Petitioner submitted new factual information.  Specifically, AKCA submitted production data for two wooden cabinet and component producers for use in Commerce's substantial transformation analysis.  VPR 658; VCR 59; MPR 153; MCR 62 (Petitioner's NFI).  No other party submitted information in response to Commerce's request.

After analyzing the new factual information, the parties' comments, case and rebuttal briefs, Commerce issued its post-preliminary determination.  VPR 691; VCR 70; MPR 182; MCR 69.  Commerce used the information available on the record to conclude that merchandise meeting Scenarios 2 and 3 are within the scope of the orders.  *Id.*  Commerce subsequently released memoranda analyzing the parties' arguments regarding a possible certification

requirement for merchandise considered in this proceeding, proposed a potential certification requirement, and invited parties to comment.  VPR 731; MPR 213 (Certification Proposal).

In its final scope ruling, Commerce concluded that merchandise meeting Scenarios 1, 2 and 3 merchandise were subject to the orders and merchandise meeting Scenario 4 was outside of the scope of the orders.  Commerce further described the certification requirement that it was implementing for subject merchandise.  Final Scope Ruling (VPR 754; VCR 73; MPR 229; MCR 74).  Commerce issued two corrections that clarified the certification requirement.  *August Correction*, 89 Fed. Reg. 63,404 (VPR 765; MPR 237) and *October Correction*, 89 Fed. Reg. 84, 532 (VPR 781; MPR 251).

## SUMMARY OF ARGUMENT

Commerce's conclusion that merchandise meeting Scenarios 1, 2, and 3 merchandise is subject merchandise is supported by substantial evidence and in accordance with law.  ACP's arguments do not demonstrate otherwise.  ACP challenges Commerce's initiation as unlawful, contending that the scope ruling request did not sufficiently define the inquiry merchandise.  Commerce reasonably concluded that the request sufficiently identified the inquiry merchandise, and that the scope ruling was not for hypothetical merchandise.

Second, Commerce found that components further processed in the third-countries are in-scope merchandise based on the plain language of the orders.  Third, Commerce followed its own regulation, consistent with appellate precedent, to conduct a country-of-origin determination in which it found that Scenarios 1, 2, and 3 did not substantially transform subject merchandise, and thus, such products were Chinese in origin.  Lastly, Commerce lawfully established a certification requirement for imports pursuant to its regulatory authority.

## ARGUMENT

7

## I.     Legal Standards

### A.     Standard For Judicial Review Of Scope Determinations

This Court "must uphold a scope ruling unless {it finds the ruling} to be 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Sango Int'l L.P. v. United States,* 484 F.3d 1371, 1378 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Crawfish Processors Alliance v. United States,* 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB,* 305 U.S. 197, 229 (1938)); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) ("{s}ubstantial evidence is more than a mere scintilla").  "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence."  *Am. Silicon Techs. v. United States,* 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1044 (Fed. Cir. 1996)). "{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*"  *Goldlink Indus. Co. v. United States,* 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted).

### B.     Legal Framework For Scope Rulings

Commerce is often called upon to determine whether a certain product is included within the scope of an antidumping or countervailing duty order because it necessarily writes scope language in general terms.  19 C.F.R. § 351.225(a).  Commerce's determinations concerning a particular product are made in accordance with its regulations.  Under 19 C.F.R. § 351.225(d),

Commerce initiates a scope ruling by its own initiative or if it deems that a party's scope application is complete.

The first step in determining whether a product is covered by an order is to consider the language of the order itself. *Arcelormittal Stainless Belgium N.V. v. United States,* 694 F.3d 82, 87 (Fed. Cir. 2012). Commerce may decide that the language of the order unambiguously applies to the product at issue, *id.*, or it may additionally consider the descriptions of the merchandise contained in the (k)(1) sources. *Tak Fat Trading Co. v. United States,* 396 F.3d 1378, 1382-83 (Fed. Cir. 2005). The (k)(1) sources are the petition, the investigation, and determinations of Commerce (including prior scope determinations) and the International Trade Commission (ITC). 19 C.F.R. § 351.225(k)(1). If Commerce determines that the descriptions of the merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling as to whether the product falls within the scope of the order. 19 C.F.R. § 351.225(d); *see also Tak Fat Trading,* 396 F.3d at 1382.

Only when the (k)(1) sources are not dispositive will Commerce consider the criteria set forth in 19 C.F.R. § 351.225(k)(2). Commerce did not conduct a subsection (k)(2) analysis here.

## II.     **Commerce's Initiation Of The Scope Inquiry Is Supported By Substantial Evidence**

Commerce may initiate scope inquiries when it believes that they are warranted, through interested party requests, or on its own initiative. 19 C.F.R. § 351.225. Here, Commerce initiated the scope inquiry because the petitioner provided a complete scope application, meeting each requirement established by 19 C.F.R. § 351.225(c)(2). Scope Ruling Application (VPR 1; VCR 1; MPR 1; MCR 1). First, the product described by the scope ruling application is not hypothetical, because it is based on a detailed description and evidence that merchandise produced under all four scenarios is currently being imported into the United States. Second, as

Commerce found, the application was complete, and therefore warranted initiation under 19

C.F.R. § 351.225(d)(1).

    ACP contends that Commerce unlawfully initiated a scope proceeding because AKCA's

application did not identify a "specific product" and, rather, is merely "hypothetical."  ACP Br.

at 28.  To the contrary, Commerce lawfully initiated the scope inquiry based upon the reasonably

available information submitted by AKCA.  Commerce found that the petitioner's detailed

description in its application furthered the regulation's intent, and Commerce permissibly

initiated a scope inquiry based on the application.  Initiation Memoranda (VPR 43; MPR 41).

Specifically, petitioner proffered evidence describing changes in export percentages following

the imposition of the orders, production practices of specific companies operating in Vietnam

and Malaysia, and evidence collected by U.S. Customs and Border Protection (CBP) in the

context of an Enforce and Protect Act (EAPA) proceeding.  Vietnam Scope Ruling Application

at 12-13 (VCR 1); Malaysia Scope Ruling Application at 13-17 (MCR 1); Final Scope Ruling at

9 (VPR 361; MPR 98).  Accordingly, the production scenarios in this case are not hypothetical

because there is record evidence demonstrating that such production scenarios exist.  This factual

information supports the conclusion that the scope ruling request was for actual, and not

hypothetical, merchandise.

    ACP relies on *Perfectus* for the proposition that Commerce does not conduct scope

rulings on "hypothetical products that do not yet exist."  *Perfectus Aluminum, Inc. v. United

States*, 836 F. Appx 883, 891 (Fed. Cir. 2020).  Commerce's initiation of this scope inquiry was

entirely consistent with  Commerce's practice.  In *Perfectus*, the court found that the

merchandise at issue was not hypothetical because there was evidence on the record of the

products' existence and importation.  Similarly, here, the products at issue are not hypothetical

because there is evidence on the record that subject merchandise further processed in Vietnam and Malaysia exists and is being imported to the United States. *Id.*; Vietnam Scope Ruling Application at 12-13 (VCR 1); Malaysia Scope Ruling Application at 13-17 (MCR 1); Final Scope Ruling at 9 (VPR 754; VCR 73; MPR 229; MCR 74).

Moreover, contrary to ACP's argument, Commerce fully addressed the application's sufficiency at length: in the initiation memoranda, the preliminary scope ruling, and the final scope ruling. Initiation Memoranda (VPR 43; MPR 41); Preliminary Scope Ruling at 36-41 (VPR 636; VCR 40; MPR 135; MCR 43); Final Scope Ruling at 8-11 (VPR 754; VCR 73; MPR 229; MCR 74). This case is therefore distinguishable from *Fabuwood*, in which Commerce's analysis of objections to the inadequacy of the request was limited to a footnote. *See Fabuwood Cabinetry Corp. v. United* States, 469 F. Supp. 3d 1373 (Ct. Int'l Trade 2020)

After issuing its supplemental questionnaire, Commerce reasonably determined that the application warranted initiation because it was complete pursuant to 19 C.F.R. § 351.225(d)(1). ACP cites Commerce's supplemental questionnaire as evidence that the application lacked specificity. ACP Br. at 31. In fact, Commerce issued the supplemental questionnaire to ensure that there was a sufficiently specific allegation. Initiation Memoranda (VPR 43, MPR 41) at 3; s*ee generally*, *Fabuwood*, 469 F. Supp at 1383. Contrary to ACP's arguments, Commerce did not "acknowledge the failure of {the petitioner} to satisfy the requirements to initiate." ACP Br. at 39. On the contrary, Commerce recognized that section 351.225(c)(2) only requires parties to provide information that was "reasonably available to them." Therefore, the petitioner was not required, as ACP suggests, to provide "detailed firsthand knowledge" of third country processing for Commerce to initiate an inquiry. Final Scope Ruling at 10-11 (VPR 754; VCR 73; MPR 229; MCR 74).

11

ACP's contention that the petitioner's failure to include a visual depiction of the product renders the scope ruling application deficient also lacks merit.  ACP Br. at 39 (citing 19 C.F.R. § 351.225(c)(2)(i)(E)).  That regulatory requirement has two limiting clauses: "to the extent reasonably available," and "as necessary."  19 C.F.R. §351.225(c)(2)(i)(E).  In this case, petitioner provided information reasonably available to it, utilizing the petition underlying the *Orders*, a public catalog of certain producers and exporters of subject merchandise, its knowledge of CBP's EAPA cases, and the websites of exporters.  Scope Ruling Application at 10 (VPR 1; MPR 1).  Additionally, because the merchandise at issue is "facially indistinguishable" from subject merchandise, Commerce found that a "visual depiction" of the product was not "necessary" for an acceptable scope ruling application.  Certification Proposal (VPR 731; MPR 213); *see also Sanchez v. United States*, 707 F. Supp. 2d 216 (D.P.R. 2010), *aff'd sub nom. Sanchez ex rel. D.R.-S. v. United States*, 671 F.3d 86 (1st Cir. 2012) (finding a statute allowing an agency to take action "as necessary" is discretionary).  In sum, the purpose of the scope ruling application requirements identified in 19 C.F.R. § 351.225(c)(2)  -- to enable "the public and CBP to more easily identify the product at issue" – were met.  *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 85 Fed. Reg. 49,472, 49,477 (Dep't of Commerce Aug. 13, 2020)).

Lastly, ACP has failed to establish substantial prejudice resulting from the alleged procedural error in initiating the scope inquiry based on information gleaned from the supplemental questionnaire response.  *Suntec Indus. Co. v. United States*, 857 F.3d 1363, 1368 (Fed. Cir. 2017).  In *Suntec*, petitioner had requested that Commerce conduct an administrative review but had failed to serve Suntec with its request as required.  Commerce then published notice of initiation in the Federal Register.  The Court explained that "[t]he crucial fact here is

that there was an intervening event between the request and the review: the Federal Register notice of initiation of the review." *Id.* at 1369.  Because publication in the Federal Register provided constructive notice of the proceeding, the Court reasoned that Suntec had failed to demonstrate substantial prejudice necessary to upset the determination. *Id.* at 1369-71.

ACP's claim is, at bottom, about notice.  Br. at 29.  Here, the "intervening event," *Suntec*, 857 F.3d at 1369, is the supplemental questionnaire response, the accuracy mof which ACP does not contest.  In sum, even if ACP could show error, which it cannot, it has failed to demonstrate it was substantially prejudiced by that error.  Accordingly, the Court should sustain Commerce's decision to initiation the scope inquiry.

**III.    Commerce's Determination That Merchandise Described In Scenarios 1, 2 And 3 Are Within The Scope Of The Orders Is Supported by Substantial Evidence**

**A.    The Plain Language Of The Scope Compels The Conclusion That Components Are Within The Scope Of The *Orders* Is Supported By Substantial Evidence**

Based on the orders' plain language, Commerce found that the components of wooden cabinets produced in China in all four of the production scenarios are subject to the orders. Preliminary Scope Ruling at 12 (VPR 636; VCR 40; MPR 135; MCR 43).  This conclusion is supported by substantial evidence and in accordance with law.

"Semifinished components" are covered by the scope language.  That phrase merely refers to components in which "certain production processes occur in China, and others in the third country."  Preliminary Scope Ruling at 20 (VPR 636; VCR 40; MPR 135; MCR 43).  The scope language in the orders specifies that:

> Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: Trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that

would not otherwise remove the merchandise from the scope of the investigation
if performed in the country of manufacture of the in-scope product.

*Orders*, 85 Fed. Reg. at 22,133; 85 Fed. Reg. at 22, 135.

The orders also specify that the following six wooden components of cabinets and

vanities are covered:

> (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes
> (which typically include a top, bottom, sides, back, base blockers, ends/end
> panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity
> doors, (4) wooden cabinet or vanity drawers and drawer components (which
> typically include sides, backs, bottoms, and faces), (5) back panels and end
> panels, (6) and desks, shelves, and tables that are attached to or incorporated in
> the subject merchandise.

*Id.*

Read together, any of these six components that are further processed in a third country

are unambiguously covered by the orders.  Scenarios 1, 2 and 3 refer to semifinished wooden

doors; drawer faces; and frames, that are produced in China and undergo further processing in

Vietnam or Malaysia.  Preliminary Scope Ruling at 9-10 (VPR 636 ; VCR 40; MPR 135; MCR

43).  Scenario 4 refers to finished toe kicks.  *Id.* at 11.  Therefore, these component parts are in-

scope.

Because Commerce found the orders' scope language to be dispositive, Commerce was

not required to consider additional factors under 19 U.S.C. § 351.225(k)(1).  In arguing that

Commerce erred by failing to consider the k(1) factors, ACP fails to address the current version

of Commerce's scope regulations.  ACP Br. at 35-36.  In 2021, Commerce amended its

regulation to provide that it would end the scope inquiry if it found the scope language alone to

be dispositive.  *Regulations To Improve Administration and Enforcement of Antidumping and*

*Countervailing Duty Laws,* 85 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021)

(*2021 Preamble*); 19 C.F.R. § 351.225(k) (2022).[2]  Pursuant to the amended regulation,

Commerce may determine whether a product is within the scope of an order by relying on the

scope language alone, if such language is dispositive.  19 C.F.R. § 351.225(k)(1).  Commerce

also has discretion to consider the additional primary and secondary sources listed in 19 C.F.R. §

351.225(k)(1).  Here, because Commerce found the scope language to unambiguously cover the

inquiry merchandise, no further analysis of the (k)(1) sources was warranted.  *See 2021*

*Preamble*, 85 Fed. Reg. at 52,322 ("in most straightforward cases, the agency is not required to

consider the four listed (k)(1) interpretive sources if such an analysis would waste agency time

and resources"); *see also Vandewater Int'l Inc. v. United States*, 130 F.4th 981 (Fed. Cir. 2025).

### B.    Commerce's Substantial Transformation Analysis Is Supported By Substantial Evidence

Commerce's country of origin finding that wooden cabinets produced under Scenarios 1,

2, and 3 do not undergo a substantial transformation in the third country is supported by

substantial evidence.  Commerce evaluated each factor in light of the totality of the

circumstances, and Commerce relied on the best available information on the record to make its

determination.

### 1.    Legal Standard for Substantial Transformation Analysis

The scope of an order is "defined by the type of merchandise and the country of origin"

and "therefore the determination of where the merchandise is produced or manufactured is a

fundamental step in the administration of the antidumping laws."  *Advanced Tech & Materials*

---

[2] Before Commerce amended the regulations in 2021, various appellate cases reflected differing views on "whether the sources under the current § 351.225(k)(1) are used to interpret the 'plain meaning' of the text of the scope, or whether the plain meaning analysis comes first{.}"  *2021 Preamble*, 85 Fed. Reg. at 52,322-23 (citing, *e.g.*, *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014); *OMG, Inc. v. United States*, 972 F.3d 1358, 1363-66 (Fed. Cir. 2020)).  Commerce's amended regulation clarifies the appropriate analysis consistent with appellate precedent.  19 C.F.R. § 351.225(k) (2022).

*Co. v. United States*, 35 C.I.T. 1380, 1384 (2011).  In determining country of origin, Commerce

conducts a substantial transformation analysis.  "{S}ubstantial transformation occurs where, 'as

a result of manufacturing or processing steps . . . {,} the {product} loses its identity and is

transformed into a new product having a new name, character and use.'"  *Bell Supply Co. LLC v.*

*United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018) (*citing Bestfoods v. United States*, 165 F.3d

1371, 1373 (Fed. Cir. 1999)).  The Federal Circuit has sustained Commerce's "substantial

transformation" analysis as a means of assessing country of origin.  *Bell Supply*, 888 F.3d at

1229 (*citing E.I. DuPont De Nemours & Co. v. United States*, 8 F.Supp.2d 854, 858 (Ct. Int'l

Trade 1998)) (noting that "in determining if merchandise exported from an intermediate country

is covered by an antidumping order, Commerce identified the country of origin by considering

whether the essential component is substantially transformed in the country of exportation").

"{The} 'substantial transformation' rule provides a yardstick for determining whether

the processes performed on merchandise in a country are of such significance as to require that

the resulting merchandise be considered the product of the country in which the transformation

occurred."  *Bell Supply*, 888 F.3d at 1229.  For subject merchandise that is further processed in a

third country before exportation to the United States, to determine the country of origin,

Commerce normally considers: (1) whether, as a result of the manufacturing or processing, the

product loses its identity and is transformed into a new product having a new name, character,

and use; and (2) whether through that transformation, the new article becomes a product of the

country in which it was processed or manufactured.  *Bell Supply*, 888 F.3d at 1228.  To assess

transformation, Commerce looks to factors such as: (1) the class or kind of merchandise; (2) the

product's properties, essential component, and intended end-use; (3) the nature and

sophistication of processing in the country of exportation; (4) the cost of production/value added;

and (5) level of investment. *Bell Supply*, 888 F.3d 1228-29; *see also* 19 C.F.R. § 351.225(j) (same factors).

> ### 2.     Commerce's Substantial Transformation Analysis Correctly Applied Controlling Law

Although the plain language of the orders was dispositive in determining that wooden cabinets *components* that undergo further processing in Vietnam and Malaysia in-scope, Commerce found it necessary to conduct a substantial transformation analysis to determine the country of origin of the third-country wooden cabinets produced in Scenarios 1-4, where a completed wooden cabinet is assembled in a third country using both components produced in China and components produced in a third country. Preliminary Scope Ruling at 13 (VPR 636; VCR 40; MPR 135; MCR 43); Final Scope Ruling at 12 (VPR 754; VCR 73; MPR 229; MCR 74).

Commerce evaluated each factor in light of the totality of the circumstances. *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ("Commerce considers the totality of the circumstances"); *see also Asia Wheel Co. v. United States*, No. 23-00096, --- F. Supp. 3d ---- 2025 WL 573718, at *12 (Ct. Int'l Trade Feb. 21, 2025), appeal docketed, no. 25-1689 (Fed. Cir.) (sustaining substantial transformation analysis that concluded that steel wheels assembled in Thailand from Chinese and Thai parts remained Chinese). Commerce also retains significant discretion in the way that it evaluates whether a substantial transformation has occurred, so long as it thoroughly explains its reasoning. *Prosperity Tieh Enter. Co. v. United States*, 965 F.3d 1320 (Fed. Cir. 2020); *2021 Preamble*, 86 Fed. Reg. at 52,321 ("Commerce must retain flexibility to adjust its country of origin analysis when the facts on the record warrant such adjustment"). Here, Commerce applied the regulation and explained its reasoning. Preliminary Scope Ruling at 13-31 (VPR 636; VCR 40; MPR 135; MCR 43); Post-Preliminary

17

Determination at 4-15 (VPR 691; VCR 70; MPR 182; MCR 69); Final Scope Ruling at 13-24 (VPR 754; VCR 73; MPR 229; MCR 74).

Commerce found that for Scenario 1, all seven factors listed under 19 C.F.R. § 351.225(j) supported a finding that there was no substantial transformation, for Scenario 2, six of the seven factors supported a finding that there was no substantial transformation, and for Scenario 3, four of the seven factors supported a finding that there was no substantial transformation. Final Scope Ruling at 24 (VPR 754; VCR 73; MPR 229; MCR 74); Post-Preliminary Determination at 15 (VPR 691; VCR 70; MPR 182; MCR 69). ACP takes issue with Commerce's analysis, even though Commerce considered the totality of the circumstances in making its substantial transformation finding. In *Bell Supply*, the Court sustained Commerce's finding that no substantial transformation occurred, despite certain factors leaning in favor of finding substantial transformation. *Bell Supply*, 393 F. Supp. 3d at 1229. Similarly, here, certain factors weighed in favor of finding a substantial transformation, and Commerce took an approach that no single factor or combination of factors was dispositive. Rather, it considered each factor and fully explained its analysis to determine that no substantial transformation occurred for Scenarios 1, 2 and 3. Preliminary Scope Ruling at 13-31 (VPR 636; VCR 40; MPR 135; MCR 43); Post-Preliminary Determination at 4-15 (VPR 691; VCR 70; MPR 182; MCR 69); Final Scope Ruling at 13-24 (VPR 754; VCR 73; MPR 229; MCR 74).

Despite the fact that "[i]t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew," *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015), ACP asks the Court to reweigh the factors, contending that the value-added, nature and sophistication of production, and level of investment prongs for Scenario 3 support finding that a substantial transformation occurred. ACP Br. at 45. We do not

dispute that these three prongs weighed in favor of a substantial transformation for Scenario 3. Final Scope Ruling at 24 (VPR 754; VCR 73; MPR 229; MCR 74).  Rather, Commerce weighed the above factors compared to its conclusion that "{q}ualitative analysis of the first prong (class or kind), the second prong (physical characteristics), and the third prong (intended end use) {as well as the "essential characteristics" prong} all indicated that substantial transformation did not occur in the third country and that China is the country of origin."  Final Scope Ruling at 24 (VPR 754; VCR 73; MPR 229; MCR 74).  Accordingly, Commerce explained that "most of the factors indicate that a substantial transformation did not occur in the third country, and therefore, the country of origin {for Scenario 3} is China."  *Id.*; *see Consolo v. Fed. Me. Comm'n*, 383 U.S. 607,620 ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").  Commerce's approach is supported by 19 C.F.R. § 351.225(j) and binding precedent.  *2021 Preamble,* 86 Fed. Reg. at 52,321 (citing *Bell Supply*, 888 F.3d 1222; *Venus Wire Industries Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289, 1299 (Ct. Int'l Trade 2020)).

Confusingly, ACP contends both that Commerce wrongly prioritized end-use and that Commerce did not sufficiently value end-use in its substantial transformation analysis.  Compare ACP Br. 44 with Br. 49.  Regardless of ACP's contradictory arguments, Commerce reasonably valued end-use as just one factor among seven.  Final Scope Ruling at 14-15 (VPR 754; VCR 73; MPR 229; MCR 74).  Additionally, ACP's arguments regarding end-use are purely speculative because they assert that the subject components *could* have been used in free-standing furniture. ACP identifies no record evidence that the components were, in fact, used that way.  ACP Br. at 48.

Furthermore, the Disney Beverage Centers Scope Ruling is irrelevant.  ACP contends that the product at issue there has a similar end-use to the components at issue here.  ACP Br. at 50, citing American Home Furnishings Alliance's Letter, "Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request" (July 7, 2022) (VPR 293) at Exhibit 5 (Commerce's Memorandum, *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Scope Ruling on Walt Disney Parks & Resorts U.S., Inc.'s Beverage Station and Centers* (May 2, 2022) (the Disney Ruling)).  However, the Disney Ruling was not a substantial transformation case.  Unlike this case, the Disney Ruling found freestanding beverage centers to be out of scope merchandise because they were not built to be affixed to any surface: "Based on the analysis of the specifications, design, and finished product images of Disney's beverage centers, the products are freestanding furniture pieces for shelving items and housing a mini fridge that are not permanently installed to the floor, wall, or ceiling." *Id.* at 5.  Moreover, the Disney Ruling involved fully assembled furniture and therefore has no relevance to the question presented here: whether Chinese components were substantially transformed into third-country products.  Lastly, although Commerce did not cite the Disney Ruling, it fully addressed ACP's argument regarding the essential characteristic of a wooden cabinet at page 23 of the Final Scope Ruling (VPR 754; VCR 73; MPR 229; MCR 74).

ACP further misapprehends *Bell Supply*, 888 F.3d 1222, contending that that case held that a substantial transformation had occurred in that case.  ACP Br. at 44.  *Bell Supply* only held that a substantial transformation analysis was warranted and remanded for this Court to rule on the merits of Commerce's substantial transformation analysis.  *Bell Supply*, 888 F.3d at 1231.  This Court then remanded for further explanation and ultimately sustained Commerce's finding that no substantial transformation had occurred.  *Bell Supply Co., LCC v. United States*, 348

F.Supp.3d 1281 (Ct. Int'l Trade 2018); *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019).  Contrary to ACP's contention, *Bell Supply* stands for the principle that Commerce must consider the totality of the circumstances and explain each factor in its substantial transformation analysis, which Commerce did here.

### 3. Substantial Record Evidence Supports Commerce's Substantial Transformation Analysis

Commerce relied primarily on the scope ruling application and petitioner's new factual information following the preliminary scope ruling to complete its substantial transformation analysis.  Preliminary Scope Ruling (VPR 636; VCR 40; MPR 135; MCR 43); Post-Preliminary Determination (VPR 691; VCR 70; MPR 182; MCR 69); Scope Ruling Application (VPR 1, VCR 1, MPR 1, MCR 1); Petitioner's NFI (VPR 658; VCR 59; MPR 153; MCR 62).  Because Commerce considers China a nonmarket economy for antidumping duty purposes, Commerce used surrogate values from a market economy at a similar level of development to value prices and production costs in China.  Preliminary Scope Ruling at 16-17 (VPR 636 ; VCR 40; MPR 135; MCR 43).  Only the petitioner submitted surrogate value data in response to Commerce's request for surrogate value information.  ACP did not provide surrogate value data for Commerce to consider.  As a result, Commerce used data from the first administrative review, regarding Qufu Xinyu Furniture Company (Qufu), and data submitted by the petitioner regarding a wooden cabinets producer (Company A, whose identity is confidential), and Wellborn Cabinet Inc. (Wellborn), a United States wooden cabinets producer.  *Id.* at 17; Post-Preliminary Determination at 2 (VPR 691; VCR 70; MPR 182; MCR 69).

ACP challenges Commerce's finding that Scenario 1 merchandise did not undergo a substantial transformation, claiming that Commerce's finding ignores "cost details, investment specifics, or detailed assembly processes."  ACP Br. at 42.  This ignores record evidence.  First,

21

Commerce took costs into account when it used a bill of materials for one of Qufu's products to analyze the cost of production and value added of further processing in the third countries because this design was the most similar to the merchandise considered by Scenario 1. Preliminary Scope Ruling at 17 (VPR 636 ; VCR 40; MPR 135; MCR 43). Second, Commerce analyzed investment specifics such as equipment value, factory space and number of workers at Company A facilities, allowing Commerce to analyze the level of investment in the third country. Post-Preliminary Determination at 2 (VPR 691; VCR 70; MPR 182; MCR 69). Third, Commerce considered detailed production processes, even changing the data source between the Preliminary Scope Ruling and the Post-Preliminary Determination to more accurately reflect the production process. *Id.* Commerce preliminarily used an ITC Report to evaluate assembly processes but used the petitioner's NFI in the Post-Preliminary Determination because that information was more detailed; allowed Commerce to "account{} for cost differences more distinctly between China and the third country;" and made "it clearer to identify the inputs and tasks in each production phase." *Id.* at 2-3. As a result, the record demonstrates that Commerce relied on substantial evidence, and performed extensive analysis, to find that Scenario 1 did not undergo a substantial transformation.

Similarly, Commerce's substantial transformation analysis for Scenarios 2 and 3 did not rely only on generalized processes, nor did Commerce exclude value added and labor costs. ACP Br. at 43. First, to determine value added, Commerce used Wellborn's cost information for a specific ready-to-assemble cabinet and Company A's production data for one month of production. Final Scope Ruling at 15 (VPR 754; VCR 73; MPR 229; MCR 74). Commerce explained that it had used this data because it is the most similar to merchandise produced under Scenarios 1-4; was reported by component; and was specific to each of the processing steps. *Id.*

Second, Commerce relied on Company A's data for labor costs because it is more accurate and differentiates labor costs between two phases of production. *Id.* at 17. Therefore, Commerce went far beyond "generalized processes," and instead supported its findings with multiple evidentiary sources. Final Scope Ruling at 17 (VPR 754; VCR 73; MPR 229; MCR 74).

ACP contends that Commerce failed to address its challenges to Commerce's evidentiary bases during the scope proceeding. ACP Br. at 43. ACP made broad claims that the evidence Commerce relied upon was insufficient, but did not explain how the alleged lack of evidence was relevant to Commerce's calculations. ACP Case Brief at 6-7 (VPR 703; MPR 194). For example, in its case brief, ACP stated that the Wellborn surrogate value data is unreliable because it is not reconciled to its financial statements, but ACP did not explain why that data was unreliable or identify any specific aspect of the data that could not be used. *Id.* at 6 (VPR 703; MPR 194); Final Scope Ruling at 18 (VPR 754; VCR 73; MPR 229; MCR 74). Even so, Commerce thoroughly addressing ACP's concerns and explaining why it ultimately disagreed with ACP's arguments. Final Scope Ruling at 11-13, 24-35 (VPR 754; VCR 73; MPR 229; MCR 74).

Additionally, Commerce preliminarily determined that there was insufficient record information to assess Scenarios 2 and 3. Preliminary Scope Ruling at 31-33 (VPR 636; VCR 40; MPR 135; MCR 43). As a result, Commerce requested that all interested parties submit surrogate value data for the substantial transformation analysis. *Id.* at 51-52. The petitioner provided Wellborn and Company A data. Petitioner's NFI (VPR 658; VCR 59; MPR 153; MCR 62). Despite not availing itself of the opportunity to submit surrogate value data, ACP now claims that the evidence Commerce relied upon to change its determination between the Preliminary Scope Ruling and the Post-Preliminary Determination is invalid. ACP Br. at 46.

When using surrogate values, Commerce must use the "best available information regarding the values of such factors in a market economy country." 19 U.S.C. §1677b(c)(1)(B). Commerce has discretion to determine what constitutes the "best available information," but generally values those surrogate values which are "publicly available, product specific, reflect a broad market average, and are contemporaneous with the period of review." *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011); *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). ACP claims that the petitioner's data did not include "specifics like cost percentages or investment data." ACP Br. at 46. However, 19 C.F.R. § 351.225(j) does not require these specific types of evidence. Rather, Commerce has discretion to choose from the best available information and did so here. *See SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) (sustaining Commerce's surrogate value selection as the best available information, in part because it was the only surrogate value information on the record). Commerce also must explain its decisions regarding data selection, which it did here. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) (Commerce "appropriately evaluated each of the alternatives on the record and provided an ample explanation as to why it should be rejected").

Commerce fully addressed each of the contentions raised at pages 46-51 of ACP's brief administratively, and the data Commerce used was the best available. First, contrary to ACP's argument, Br. at 47, Wellborn's cost of production data is comparable to China, Vietnam, and Malaysia. Commerce explained that it found the Wellborn data reliable because it was, "for an {ready to assemble} wooden cabinet which is similar to scenario merchandise and the data was reported by component, and phase specific, which enabled {Commerce} to identify where the

processing steps were conducted for each country." Final Scope Ruling at 15-16 (VPR 754; VCR 73; MPR 229; MCR 74).

Second, ACP argues that the Wellborn data is unreliable because cabinets assembled in China, Vietnam, and Malaysia use more expensive plywood, while Wellborn cabinets use less expensive particle board. ACP Br. at 47. ACP further argues that the Wellborn cabinet data is not comparable because its product was not a typical ready-to-assemble cabinet, like the subject merchandise. *Id.* However, Commerce offset these comparability concerns by using the Wellborn data along with data from prior reviews. Final Scope Ruling at 16 (VPR 754; VCR 73; MPR 229; MCR 74). To value plywood consumption, Commerce used maple hardwood as a surrogate value to birch, even though maple hardwood is generally more expensive than birch. *Id.* Commerce also explained that it used Malaysian import data for the first period of review to value oak and particle board, so its surrogate values were comparable to Malaysian cabinets. *Id.* Commerce further used the "best available information" to find that Wellborn's cabinets match the established production phases best, and the law does not require a perfect match. 19 U.S.C. §1677b(c)(1)(B).

Third, ACP contends that the Wellborn data does not provide by-product rates, so the cost percentage is overstated and distorted. ACP Br. at 48. But Commerce explained that it accounted for by-products by valuing the total volume of wood at the input stage, before the wood is formed into the subject merchandise. Final Scope Ruling at 16 (VPR 754; VCR 73; MPR 229; MCR 74). Also, because no party submitted surrogate values for by-products like millings and cuttings, Commerce could not have valued scrap more specifically. *Id.* at 17.

Fourth, ACP contends that the Wellborn data inconsistently used direct U.S. dollar costs and surrogate values, resulting in "mixed calculations." ACP Br. at 48. However, Commerce

explained that it used surrogate values for nearly all inputs, and only a few minor inputs (*e.g.* glue, staples, abrasives) were reported in USD. Final Scope Ruling at 17 (VPR 754; VCR 73; MPR 229; MCR 74). These minor inputs only account for a small fraction of the cost, so Commerce did not consider that this very small difference rendered the entire data set invalid. *Id.* Furthermore, ACP fails to identify any distortion from the use of this data. *Id.*

Fifth, ACP asserts that Commerce's phase 3 labor consumption rate is inaccurate because it ignores varying levels of production and mechanization. ACP Br. at 48. However, Commerce explained that it evaluated multiple record data sources before concluding that Company A data was the most accurate representation of labor costs because it differentiates labor costs between phases 2 and 3. Final Scope Ruling at 17 (VPR 754; VCR 73; MPR 229; MCR 74). This reasoned analysis is supported by substantial evidence.

Sixth, ACP argues that the Wellborn data did not include the "correct number of drawer slides, drawer pulls, doorknobs, etc." ACP Br. at 48. But Commerce accounted for these differences by adding value for a second set of drawer slides and including the same amount for phase 1(b) nails to value the phase 3 screws. Final Scope Ruling at 17 (VPR 754; VCR 73; MPR 229; MCR 74).

Therefore, Commerce thoroughly addressed each allegation regarding its selected methodology. Unlike *Agilent*, where the Court found the agency's analysis not to have addressed contrary evidence, here, Commerce's analysis was comprehensive, and Commerce evaluated the Wellborn data for its value and applicability. *Agilent Techs. v. United States*, 256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017). Additionally, Commerce did not summarily dismiss ACP's arguments because it failed to submit additional data. ACP Br. at 48. Rather, Commerce relied on the "best available information," which required Commerce to weigh the only

26

information on the record — the Qufu, Company A, and Wellborn data — and explained which information was the "best" in each circumstance to allow Commerce to complete its substantial transformation analysis. 19 U.S.C. § 1677b(c)(1)(B); 19 C.F.R. § 351.225(j).

Lastly, ACP cites *Venus Wire Indus. Pvt. Ltd. v. United States*, 424 F. Supp. 3d 1369 (Ct. Int'l Trade 2019), to support its contention that Commerce relied upon deficient information in its substantial transformation analysis. ACP Br. at 50. *Venus Wire* is inapposite. The issue in *Venus Wire* was whether Commerce should have performed a substantial transformation analysis, which is not at issue here. 424 F. Supp. 3d at 1377-78. Here, Commerce performed a substantial transformation analysis, which considered the totality of the circumstances and is supported by substantial evidence.

## IV.    Commerce's Certification Regime is Supported by Substantial Evidence and In Accordance with Law

Commerce may establish certification requirements for merchandise subject to antidumping or countervailing duty orders. 19 C.F.R. § 351.228; *2021 Preamble*, 86 Fed. Reg. at 52,383. As in other cases, Commerce determined to establish a certification requirement because in-scope merchandise was indistinguishable on its face from out-of-scope merchandise at the border. Final Scope Ruling at 27 (VPR 754; VCR 73; MPR 229; MCR 74) (citing *Aluminum Extrusions From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 Fed. Reg. 39, 805 (Aug. 12, 2019), and accompanying IDM at Comment 3 and *Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 Fed. Reg. 29, 164 (June 21, 2019) and accompanying IDM at 21).

ACP challenges Commerce's authority to establish a certification requirement in the absence of express statutory authority.  ACP Br. at 52.  Congress has delegated responsibility to Commerce to implement and administer the antidumping and countervailing duty laws, which create an "intricate framework," and Congress is unable to anticipate legislation for every possible intricacy.  *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983).  Indeed, the Court of Appeals for the Federal Circuit made abundantly clear that Commerce is the agency entrusted with day-to-day responsibility:

> Commerce may not act arbitrarily or unreasonably, and may not abuse the discretion Congress has granted, but *there is no stultifying requirement that it cite a statute detailing <u>in haec verba</u> the specific action it may take when confronted with a particular set of circumstances among the myriad that may occur.* To so require would be to envisage a prescient Congress in continuous session and devoting a majority of its effort to writing statutes on the daily management of our international trade relations, including much of what may be considered administrivia.

 *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984).  Put another way, "Commerce must exercise its discretion 'in light of all the facts before' it and in a manner that reflects Commerce's 'judgment regarding the scope and form of an order that will best effectuate the purpose of the'" Tariff Act. *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019) (quoting *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1583 (Fed. Cir. 1990)).

Nor does Commerce's certification requirement intrude upon Customs and Border Protection (CBP)'s responsibility to collect antidumping and countervailing duties.  ACP Br. at 51; *2021 Preamble*, 86 Fed. Reg. at 52,364 (section "351.228 is not intended to supplant CBP's authority"); *Greentech Energy Sols., Inc. v. United States*, 714 F. Supp. 3d 1315, 1330 (Ct. Int'l Trade 2024) ("When promulgating the regulation, Commerce maintained for itself an ongoing role in resolving issues that arise when dealing with compliance with the certification

requirements"). Therefore, Commerce's regulation allowing establishment of certification

requirements, and its subsequent establishment of such a requirement, was lawful.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's final scope

Ruling and enter judgment in favor of the United States.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | YAAKOV M. ROTH<br>Acting Assistant Attorney General |
|  | PATRICIA M. McCARTHY<br>Director |
|  | /s/Tara K. Hogan<br>TARA K. HOGAN<br>Assistant Director |
|  | /s/ Margaret J. Jantzen |
| OF COUNSEL | MARGARET J. JANTZEN<br>Senior Trial Counsel |
| HEATHER HOLMAN | Commercial Litigation Branch |
| Attorney | Civil Division |
| Office of the Chief Counsel | U.S. Department of Justice |
|   for Trade Enforcement and Compliance | P.O. Box 480, Ben Franklin Station |
| United States Department of Commerce | Washington, D.C. 20004 |
|  | Telephone: (202) 353-7994 |
|  | E-mail: Margaret.j.jantzen@usdoj.gov |
| June 6, 2025 | *Attorneys for Defendant* |