UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ACPRODUCTS, INC., ACPI WOOD PRODUCTS, LLC, CABINETWORKS GROUP MICHIGAN, LLC, CABINETWORKS GROUP MIDDLEFIELD, LLC, MASTER WOODCRAFT CABINETRY L.L.C., and SMART, LLC,<br><br>        *Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br><br>        *Defendant,*<br><br>   and<br><br>AMERICAN KITCHEN CABINET ALLIANCE,<br><br>        *Defendant-Intervenor.* | Court Nos. 24-00155, 24-00156<br><br>PUBLIC VERSION |

**THE AMERICAN KITCHEN CABINET ALLIANCE'S RESPONSE
TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for the American
Kitchen Cabinet Alliance*

Dated: June 6, 2025

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

STATEMENT PURSUANT TO RULE 56.2(c)(1) ....................................................... 2

I.      Administrative Determination Under Review ..................................................... 2

II.     Issues Presented for Review .......................................................................... 2

STANDARD OF REVIEW ................................................................................... 3

STATEMENT OF FACTS ................................................................................... 5

    A.   Evidence of WCV from China Being Shipped and Further Processed in
         Malaysia and Vietnam to Evade the Orders ................................................. 5

    B.   The AKCA's Requests for Scope and Anti-Circumvention Inquiries and
         Commerce's Initiation of the Inquiries ....................................................... 8

    C.   Commerce's Preliminary Scope Determinations ......................................... 11

    D.   Commerce Seeks Additional Information from the Interested Parties and
         Only the AKCA Responds .......................................................................... 12

    E.   Commerce's Post-Preliminary Analysis, Final Scope Rulings, and Certification
         Requirements ........................................................................................... 13

SUMMARY OF ARGUMENT ............................................................................. 15

ARGUMENT ................................................................................................... 16

I.      Commerce Lawfully Initiated the Scope Inquiries on WCV Originating in
    China and Completed in Malaysia and Vietnam ............................................. 16

II.     Commerce Properly Determined that Semi-Finished WCV Components Are
    Covered by the Scope of the Orders ............................................................. 25

III.    Commerce's Substantial Transformation Analysis Is Supported by
    Substantial Evidence .................................................................................. 30

IV.     The Certification Requirements Imposed by Commerce Are Lawful ............ 36

CONCLUSION ................................................................................................. 39

CERTIFICATE OF COMPLIANCE

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001) ..................... 3

*Bell Supply Co., LLC v. United* States, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ........................................................... 19

*Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018)............... 20

*Fabuwood Cabinetry Corp. v. United States*, 469 F. Supp. 1373, 1383 (Ct. Int'l Trade 2020)................................................................. 16, 23, 24

*Fabuwood Cabinetry Corp. v. United States*, 519 F. Supp. 3d 1335, 1339 (Ct. Int'l Trade 2021) ...................................................... 24

*King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) ............. 3, 4, 37

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310 (Fed. Cir. 2024) ....................................................... 3, 4, 18, 30

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) ................. 3, 37

*Shanghai Tainai Bearing Co. v. United States*, 658 F. Supp. 3d 1269 (Ct. Int'l Trade 2023)................................................................. 35

*SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263 (Ct. Int'l Trade 2023) ........................................................... 30

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................... 3

**Other Authorities**

*Certain Quartz Surface Products From the People's Republic of China: Final Scope Ruling on Malaysian Processed Quartz Slab and Recission of the Circumvention Inquiry*, 87 Fed. Reg. 64,009 (Dep't Commerce Oct. 21, 2022)................................................................. 38

*Glycine From the People's Republic of China: Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order,*77 Fed. Reg. 73,426 (Dep't Commerce Dec 10, 2012) ........................... 37

*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't Commerce Sept. 20, 2021)................................................................. 22, 23, 37

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, Final Scope Determination, Certification Requirements, and Recission of Circumvention Inquiries on the Antidumping and Countervailing Duty* Orders*, 89 Fed. Reg. 58,110 (Dep't Commerce, July 17, 2024)*.......................................................................... 2

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126, 22,132-33 (Dep't Commerce April 21, 2020) ...................................................... 5

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 Fed. Reg. 22,134, 22,135-36 (Dep't Commerce April 21, 2020) ...................................................... 5

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Rescission of Antidumping Duty New Shipper Review; 2020*, 86 Fed. Reg. 62,788 (Dep't Commerce Nov. 12, 2021) ............ 28

## Regulations

19 C.F.R. § 351.225(a) ............................................................................... 17

19 C.F.R. § 351.225(j) ................................................................................ 12

19 C.F.R. § 351.225(k)(1)......................................................................... 4, 27

19 C.F.R. § 351.228................................................................................... 38

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ACPRODUCTS, INC., ACPI WOOD PRODUCTS, LLC, CABINETWORKS GROUP MICHIGAN, LLC, CABINETWORKS GROUP MIDDLEFIELD, LLC, MASTER WOODCRAFT CABINETRY L.L.C., and SMART, LLC, | | |
| *Plaintiffs,* | Court Nos. 24-00155, 24-00156 | |
| v. | PUBLIC VERSION | |
| UNITED STATES, | | |
| *Defendant,* | | |
| and | | |
| AMERICAN KITCHEN CABINET ALLIANCE, | | |
| *Defendant-Intervenor.* | | |

**THE AMERICAN KITCHEN CABINET ALLIANCE'S RESPONSE
TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuit to Rule 56.2 of this Court, defendant-intervenor, the American Kitchen Cabinet Alliance ("AKCA"), hereby submits its response to the motion for judgment on the agency record filed by Plaintiffs ACProducts, Inc., ACPI Wood Products, LLC, Cabinetworks Group Michigan, LLC, Cabinetworks Group Middlefield, LLC, Master Woodcraft Cabinetry L.L.C., and Smart, LLC (collectively "Plaintiffs") (ECF 36).

## <u>STATEMENT PURSUANT TO RULE 56.2(c)(1)</u>

**I.     Administrative Determination Under Review**

The determinations challenged here are the final scope rulings issued by the U.S. Department of Commerce ("Commerce") concerning certain semifinished wooden cabinets and vanities and components thereof ("WVC") that originate in China and are further processed in Malaysia and Vietnam before being exported to the United States. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China, Final Scope Determination, Certification Requirements, and Recission of Circumvention Inquiries on the Antidumping and Countervailing Duty* Orders, 89 Fed. Reg. 58,110 (Dep't Commerce, July 17, 2024) ("Final Det.") (Appx5350-5354), and accompanying Final Scope Ruling Memorandum for Malaysia (Appx5305-5346) ("MY Ruling") and Final Scope Ruling Memorandum for Vietnam.

**II.     Issues Presented for Review**

Plaintiffs' challenge presents the following issues for the Court to resolve:

(1)   Did Commerce err when it initiated an inquiry to determine whether certain semifinished WCV components originating in China remained within the scope of the antidumping and countervailing duty ("AD/CVD") orders on WCV from China (the "Orders") after the WCV components had undergone further processing in Malaysia and Vietnam?

(2)   Should the Court overturn Commerce's finding that semifinished WCV components originating in China are covered by the scope of the Orders?

(3)   When Commerce used a substantial transformation analysis to determine the country of origin of WCV from China that had undergone further processing in Malaysia and Vietnam, was the agency's determination that the further processed merchandise remains covered by the scope of the Orders

2

unsupported by substantial evidence or otherwise not in accordance with law?

(4)  Did Commerce abuse its authority when it imposed a country-wide certification process to ensure that WCV imported from Malaysia and Vietnam is not covered by the scope of the Orders on WCV from China?

As established below, the answer to each of these questions is no.

## STANDARD OF REVIEW

In AD/CVD cases, the Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). In the Court's review of the agency's scope rulings, it must accord deference to Commerce's own interpretation of its AD/CVD orders. *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310, 1322 (Fed. Cir. 2024), *cert. denied sub nom.*, 145 S. Ct. 1309 (2025) (citing *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012)). This deference is appropriate because determinations as to the meaning and scope of AD/CVD orders are matters "particularly within the expertise" of Commerce and its "special competence." *Id.* (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)).

Under the substantial evidence review standard, even if an inconsistent conclusion could be drawn from the record, "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001). A party

challenging Commerce's scope ruling under the substantial evidence standard "has chosen a course with a high barrier to reversal." *King Supply*, 674 F.3d at 1348 (citation omitted).

There is no specific statutory provision that governs the interpretation of the scope of an AD/CVD order. *Saha Thai*, 101 F.4th at 1323 (citation omitted). The regulations provide an analytical framework guiding Commerce's reasoning and analysis in reaching a scope ruling. *Id.* Commerce must begin a scope determination inquiry with a review of the scope language of the order. *Id.* "If the scope language expressly and dispositively resolves whether the subject merchandise falls within or outside of the scope, the scope analysis comes to an end." *Id.* If the scope language *itself* does not clearly answer the scope question, Commerce continues its interpretation to understand the meaning of the scope language by consulting criteria identified in 19 C.F.R. § 351.225(k)(1), the so-called (k)(1) factors or (k)(1) materials. *Id.* The (k)(1) materials include the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of Commerce (including prior scope determinations) and the U.S. International Trade Commission. *Id.* (citing 19 C.F.R. § 351.225(k)(1)).

4

## STATEMENT OF FACTS

The facts relevant to this response brief are set out below.

### A. Evidence of WCV from China Being Shipped and Further Processed in Malaysia and Vietnam to Evade the Orders

On April 21, 2020, following petitions brought by the AKCA, Commerce issued the AD/CVD Orders on WCV from China. *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126, 22,132-33 (Dep't Commerce April 21, 2020); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 Fed. Reg. 22,134, 22,135-36 (Dep't Commerce April 21, 2020). Even before Commerce had completed its AD/CVD investigations on WCV from China, however, there was a surge in both: (1) exports of WCV from China to Malaysia and Vietnam; and (2) imports of WCV from Malaysia and Vietnam to the United States. In particular:

- Exports of WCV and components thereof from China to Malaysia surged in the 33-month period following the initiation of the AD/CVD investigations (April 2019–December 2021) when compared to the immediately preceding 33-month period (July 2016–March 2019). *See* AKCA Malaysia Scope Application (Apr. 22, 2022) (Appx1001-1879) at Attachment 1, p.13. Specifically, Chinese exports of WCV and components thereof to Malaysia increased from $766 million to $1.8 billion—a 137 percent increase. *Id.* During the same period, U.S. imports of WCV and components thereof from China decreased by 53.9 percent (from $11.1 billion to $5.1 billion) and U.S. imports of such products from Malaysia increased by 279.8 percent (from $398 million to $1.5 billion). *Id.*

- Vietnam also began importing massive quantities of WCV and components thereof from China. AKCA Vietnam Scope Application (Apr. 22, 2022) (VPR 1)[1] at Attachment 1, p.12. Specifically, in the 33-month period following the initiation of the AD/CVD investigations when compared to the immediately preceding 33-month period, Vietnamese imports of WCV and components thereof from China increased from $232,126,911 to $810,368,322 – a 249.1% increase. *Id.* During the same period, U.S. imports from Vietnam increased by 137 percent. *Id.*

The sudden and sharp increase of U.S. imports of WCV from Malaysia and Vietnam, coupled with both an increase in Malaysian and Vietnamese imports of WCV and components thereof from China and a decrease in U.S. imports from China, indicated that companies in Malaysia and Vietnam were shipping Chinese-origin WCV and components thereof to the United States to evade the Orders.

The evidence of evasion did not end with the import statistics. For example, Shenzhen Jingwei International Freight Forwarding Co., Ltd., a Chinese transshipment logistics company that does business under the trade name "Kingtrans," explained on its website that "Malaysia is an important transit country for our company's re-export trade." AKCA Malaysia Scope Application (Apr. 22, 2022) (Appx1001-1879) at Attachment 1, p. 14 and Exhibit 15. The website had a

---

[1] When citing to the administrative record for Vietnam, we refer to the document numbers instead of appendix page numbers (*e.g.,* Appx00001), because, as of the time of this filing and despite numerous requests, plaintiffs have not yet provided us with a complete table reflecting the assigned Bates-page numbers of the record or a complete compilation of the record with the Bates-number pagination. *See* Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Sept. 30. 2022). Once we received the complete appendix, we will file a corrected brief that incorporates citations to appendix page numbers.

page entitled "Re-Export University" with topics such as "Can third country re-export trade avoid anti-dumping duties?," "How to collect payment for re-export trade?," and "Can factories in transit countries be used for re-export trade?" *Id.* A section of the website boasts of "Success Cases" that it has had with transshipping different products to the United States to avoid the payment of duties, and one such case is entitled "{a} successful case of cabinet re-export to the U.S.-Effective evasion of U.S. 283.11% double anti-tariff." *Id.* Kingtrans detailed the step-by-step process for how it was able to "re-export" Chinese-origin WCV through Malaysia.

By April 2022, because of this rampant evasion, U.S. Customs and Border Protection ("CBP") had completed three investigations and initiated one additional investigation under the Enforce and Protect Act ("EAPA") involving U.S. imports of Chinese origin WCV that had been falsely declared as Malaysian origin. *Id.* at Attachment 1, pp. 15-16. The evidence showed that many Malaysian companies were further processing WCV components originating in China. *Id.* CBP had also reached a final determination of evasion in an EAPA investigation involving Chinese WCV that had been further processed in Vietnam and declared by the U.S. importer not to be covered by the Orders against China. AKCA Vietnam Scope Application (Apr. 22, 2022) (VPR 1) at Attachment 1, pp.12-13.

### B. The AKCA's Requests for Scope and Anti-Circumvention Inquiries and Commerce's Initiation of the Inquiries

On April 22, 2022, based on the evidence outlined above, the AKCA filed requests that Commerce initiate scope inquiries and circumvention inquiries to determine whether imports of WCV produced using WCV components manufactured in China that undergo further processing in Malaysia or Vietnam are covered by the Orders on WCV from China. The AKCA's requests were filed using Commerce's standardized application and included all reasonably available information and documentation that is requested under 19 C.F.R. § 351.225(c). The AKCA's scope ruling applications described the merchandise at issue as finished and unfinished WCV components produced in China, which are then exported to Vietnam or Malaysia for further processing and combined with components from Vietnam or Malaysia into ready-to-assemble ("RTA") cabinets before being exported to the United States. AKCA Malaysia Scope Application (Apr. 22, 2022) (Appx1001-1879) at Attachment 1; AKCA Vietnam Scope Application (Apr. 22, 2022) (VPR 1) at Attachment 1. The AKCA requested that if Commerce reached affirmative rulings, the agency should also implement a certification requirement to require U.S. importers and their Malaysian or Vietnamese suppliers to provide CBP with a certification, at the time of entry, that the importer did not import, and the exporter did not ship, WCV that originates from China. AKCA Malaysia Scope Application (Apr. 22, 2022) (Appx1001-1879) at Attachment 1, p. 25.

8

After reviewing the AKCA's scope ruling applications, Commerce issued a supplemental questionnaire containing the following question that sought additional clarification regarding the product description:

> Please clarify the product that is covered by your April 22, 2022, application for scope and circumvention inquiries, concerning Chinese-origin wooden cabinets and vanities (WCV) and components thereof. Specifically, address the coverage of the requested product with respect to WCV cabinets, vanities, and components which were: 1) sourced from China; 2) further processed in Vietnam; and 3) exported from Vietnam to the United States. Be as specific as possible on the WCV variations and components for which you seek scope and circumvention inquiries (including sources of various components and the further processing performed in Vietnam).[2]

Commerce Letter to AKCA re: Questionnaire (May 13, 2022) (Appx1927-1928). In response, the AKCA provided the requested clarification with a more detailed narrative description and an illustrative list of the following four production scenarios:

> <u>Scenario 1:</u> A Malaysian company imports finished WCV doors, drawer fronts, and frames that are produced in China. The Malaysian company produces WCV boxes and drawers in Malaysia. The Malaysian company combines the WCV doors, drawer fronts, and frames that are produced in China with the WCV boxes and drawers produced in Malaysia, resulting in merchandise that still meets the description of the scope of the Orders.
>
> <u>Scenario 2:</u> A Malaysian company imports semifinished WCV doors, drawer fronts, and frames that are produced in China. The Malaysian company performs further processing of these components from China in Malaysia such as trimming, cutting, notching, punching, drilling,

---

[2] The same supplemental questionnaires were issued in the scope segments relating to imports from both Malaysia and Vietnam.

painting, staining, or other finishing processes. The Malaysian company produces WCV boxes and drawers in Malaysia. Finally, the Malaysian company combines the WCV doors, drawer fronts, and frames that are produced in China with the WCV boxes and drawers produced in Malaysia, resulting in merchandise that still meets the description of the scope of the Orders.

Scenario 3: A Malaysian company imports semifinished parts of WCV doors, drawer fronts, and frames that are produced in China. The parts of the WCV doors, drawer fronts, and frames include the rails, stiles, and panels. The Malaysian company performs further processing of these parts from China in Malaysia such as trimming, cutting, notching, punching, drilling, painting, staining, or other finishing processes, including the assembly of the parts to produce fully finished WCV doors, drawer fronts, and frames. The Malaysian company produces WCV boxes and drawers in Malaysia. Finally, the Malaysian company combines the WCV doors, drawer fronts, and frames that are produced in China with the WCV boxes and drawers produced in Malaysia, resulting in merchandise that still meets the description of the scope of the Orders.

Scenario 4: A Malaysian company imports finished WCV toe kicks that are produced in China. The Malaysian company produces all other WCV components necessary for a complete cabinet or vanity in Malaysia. The Malaysian company combines the WCV toe kicks produced in China with the WCV components made in Malaysia, resulting in merchandise that still meets the description of the scope of the Orders.

AKCA Response to Request for Additional Information (May 17, 2022) at 5–6

(Appx1942-1952).

On May 24, 2022, Commerce accepted the AKCA's scope ruling applications

as clarified in the supplemental questionnaire response and initiated these scope

inquiries. *See* Commerce Initiation Memoranda (May 24, 2022) (Appx1972-1975). In

so doing, Commerce determined that the AKCA satisfied the requirements of 19

10

C.F.R. § 351.225(c)(2) and included a sufficiently detailed description of the product at issue to initiate these inquiries. The AKCA's scope ruling applications, the monthly *Federal Register* notice of scope ruling applications, the AKCA's pre-initiation supplemental questionnaire response, and Commerce's initiation memorandum put interested parties on notice regarding the products at issue in these scope inquiries. *See Notice of Scope Ruling Applications Filed in Antidumping and Countervailing Duty Proceedings*, 87 Fed. Reg. 31,520, 31,520 n.4 (Dep't Commerce May 24, 2022).

### C. Commerce's Preliminary Scope Determinations

On March 16, 2023, Commerce issued its preliminary scope determination. *See* Memorandum re: Preliminary Scope Determination for Malaysia (Mar. 16, 2023) ("Malay. Prelim.") (Appx3935-3986). In the preliminary determination, Commerce found it was necessary to evaluate the country of origin of WCV completed in Malaysia and Vietnam that contains in-scope WCV components from China. *See* Malay. Prelim. at 13. To conduct such an evaluation, consistent with its regulations, Commerce conducted a substantial transformation analysis that included the following factors:

    (i)  Whether the processed downstream product is a different class or kind of merchandise than the upstream product;

    (ii)  The physical characteristics (including chemical, dimensional, and technical characteristics) of the product;

    (iii) The intended end-use of the downstream product;

(iv) The cost of production/value added of further processing in the third country or countries;

(v) The nature and sophistication of processing in the third country or countries; and

(vi) The level of investment in the third country or countries.

*Id.* (citing 19 C.F.R. § 351.225(j)). Commerce also considered the question of where the essential component of the product is produced or where the essential characteristics of the product are imparted. *Id.* After considering these factors, Commerce determined that Scenario 1 merchandise is covered by the scope of the Orders and that Scenario 4 merchandise is not covered by the scope of the Orders. *Id.* at 1.

### D. Commerce Seeks Additional Information from the Interested Parties and Only the AKCA Responds

To reach its findings in the preliminary determination with respect to Scenarios 1 and 4, Commerce based its calculation of the cost of production and value added in the third countries on information submitted by the mandatory respondent Qufu Xinyu Furniture Company Ltd. ("Qufu") in the first administrative review of the AD Order. *Id.* at 16. However, there were a number of problems that Commerce identified in attempting to use Qufu's information to perform these calculations. For example, because Qufu did not report its costs in a manner that divided different processes across the different phases of production, Commerce could not devise a method by which to analyze cost and the value-added nature of

inputs introduced into the production process in the third country. *Id.* at 27. In addition, the record lacked information relevant to the level of investment in the third country, including any information regarding the costs of the equipment and facilities required to house production in a two-country production chain. *Id.* Commerce thus asked all parties to submit information that would allow it to complete a substantial transformation analysis for Scenarios 2 and 3. *Id.* at 51.

In response to Commerce's request, the AKCA submitted additional information that allowed Commerce to evaluate the country of origin of Scenarios 2 and 3 using a substantial transformation analysis and thus issue a scope determination for these two scenarios. AKCA New Factual Information (Apr. 13, 2023) (Appx4572-4640; Appx82642-82711). No other party submitted any information to assist Commerce in conducting its substantial transformation analysis. Moreover, no party submitted any information to rebut, clarify, or correct the factual information submitted by the AKCA. As a result, the AKCA's information was the only information on the record to determine the country of origin of Scenarios 2 and 3.

### E. Commerce's Post-Preliminary Analysis, Final Scope Rulings, and Certification Requirements

On September 28, 2023, Commerce issued a post-preliminary analysis addressing Scenarios 2 and 3. Commerce Post-Preliminary Analysis Memorandum for Malaysia (Sept. 28, 2023) (Appx4953-4961); Commerce Post-Preliminary

13

Analysis Memorandum for Vietnam (Sept. 28, 2023) (VPR 691). Based on the

factual information submitted by the AKCA, Commerce determined that the

products described in Scenarios 1, 2, and 3 were all Chinese origin and therefore

covered by the scope of the Orders. *Id.*

On April 3, 2024, based on comments from interested parties, Commerce

issued a memorandum proposing establishment of a certification regime and invited

parties to comment. *See* Commerce Memoranda Providing an Opportunity to Rebut

Arguments Concerning Certification (Dec. 4, 2023) (Appx5066-5067). Commerce

explained that, because the products of the scope inquiry are facially

indistinguishable from non-subject merchandise, a certification regime was

appropriate to aid in enforcement and prevent evasion of the Orders. *Id.* at 8.

On July 10, 2024, Commerce issued its final scope rulings. MY Ruling

(Appx5305-5346). Commerce continued to determine that Scenarios 1, 2, and 3 are

Chinese in origin and thus covered by the Orders. *Id.* at 1. Commerce also continued

to find that Scenario 4 is third country in origin and thus not covered by the scope of

the Orders. *Id.* Finally, Commerce determined that it had the authority to

implement and establish a country-wide certification regime.

On September 16, 2024, Plaintiffs commenced these actions by filing

complaints challenging Commerce's final scope rulings. Complaint, Ct. No. 24-

00155 (Sept. 9, 2024) (ECF 9); Complaint, Ct. No. 24-00156 (Sept. 9, 2024) (ECF 9).

14

## SUMMARY OF ARGUMENT

The Court should reject Plaintiffs' baseless challenge to Commerce's initiation of the underlying scope inquiries. The AKCA's detailed scope application and supplemental submissions left no ambiguity about the specific merchandise at issue and provided more than an adequate basis for Commerce to issue a scope ruling. Plaintiffs' claim that the AKCA failed to identify a "particular product" in its application fails because it is based on a narrow meaning of the term "particular." Commerce's regulations require that a scope application includes a detailed and distinct description of the product in the request but do not require applicants to identify a specific product in existence. Moreover, binding Federal Circuit precedent holds that the relevant physical characteristics described in a scope inquiry can include processing that takes place in a third country.

Commerce rightly concluded that semifinished components are covered by the scope of the Orders at the time they are exported. Plaintiffs' reading would nullify clear scope language covering WCV "whether or not surface finished or unfinished, and whether or not completed," as well as products "that have been further processed in a third country," which has meaning only if the scope already includes semifinished components produced in China. As demonstrated in greater detail below, the original AD/CVD petition and prior rulings by Commerce further support this interpretation of the plain language of the scope.

Equally meritless is Plaintiffs' claim that Commerce's substantial transformation analysis lacks evidentiary support. Commerce meticulously examined each of the seven regulatory factors for all four production scenarios and weighed the evidence under each factor to arrive at its final scope determinations. Plaintiffs ask this Court to do what is forbidden under the standard of review: reweigh the evidence and substitute the court's judgment for that of the agency. Their grievance amounts to little more than disagreement with an outcome they do not like.

Finally, Plaintiffs' objection to Commerce's certification requirement is yet another hollow complaint. The certification mechanism is a lawful, necessary enforcement tool—authorized by regulation, grounded in agency practice, and critical to the integrity of the Orders. Plaintiffs' effort to portray it as novel or unlawful betrays a fundamental misunderstanding of Commerce's authority and responsibility. There is no legal or factual basis for this Court to disturb it.

## <u>ARGUMENT</u>

## I.    Commerce Lawfully Initiated the Scope Inquiries on WCV Originating in China and Completed in Malaysia and Vietnam

As the court has previously recognized, when initiating a scope inquiry, "Commerce must address the "threshold question of whether the request was specific enough to provide an adequate basis for a scope ruling." *Fabuwood Cabinetry Corp. v. United States*, 469 F. Supp. 1373, 1383 (Ct. Int'l Trade 2020).

Here, as detailed above, after Commerce requested clarification from the AKCA, the AKCA provided four specific scenarios to be covered by the scope inquiries. AKCA Response to Request for Additional Information (May 17, 2022) at 5–6 (Appx1942-1952). The AKCA's supplemented scope inquiry requests met the relevant legal standard because they provided detailed, fact-specific descriptions of each production scenario, including the origin of each component, the processing performed in the third countries, and the final assembly steps. *Id.* These scenarios clearly identify the merchandise at issue and explain how it may fall within the scope of the Orders, giving Commerce an adequate basis to evaluate whether a scope ruling was warranted.

The Court should reject Plaintiffs' argument that Commerce's initiation of the scope inquiries was unlawful because the AKCA's scope ruling applications "failed to identify a particular product" but instead offered "only a list of hypotheticals." Plaintiffs' Opening Brief (Feb. 27, 2025) (ECF 24) ("Pls. Br.") at 32. Commerce's regulations state that "{q}uestions sometimes arise as to whether a *particular* product is covered by the scope of an antidumping or countervailing duty order." 19 C.F.R. § 351.225(a) (emphasis added). Commerce will thus "initiate and conduct a scope inquiry and issue a scope ruling to determine whether or not a product is covered by the scope of an order at the request of an interested party or on the Secretary's initiative." *Id.* Plaintiffs attempt to confine the term "particular" in the regulations to mean "of, relating to, or being a single person or thing," but the

17

term also means "of, relating to, or concerned with details." *See* Merriam-Webster

Dictionary, available at https://www.merriam-webster.com. Here, the term

"particular" in Commerce's regulations signals that Commerce requires a detailed

and distinct description of the product in the scope request, but the request does not

necessarily have to identify a specific product in existence. Indeed, if Commerce's

scope rulings were limited only to particular items of merchandise in existence

instead of having broader application to all merchandise reflecting the relevant

physical characteristics, the rulings would be of little use to parties seeking to

import merchandise after the rulings are issued.

Stated another way, there was no need to identify a "particular" cabinet in

existence with specific dimensions, style, wood type, or surface finish, because none

of those physical characteristics were relevant to the scope inquiry. The relevant

physical characteristics involved the semifinished state of the WCV components

when they left China and the further processing that took place in Malaysia and

Vietnam to complete the products. The Federal Circuit's ruling in *Saha Thai* is

instructive in this regard. In *Saha Thai*, Commerce initiated a scope inquiry to

determine whether "dual-stenciled standard and line pipe" were covered by the AD

duty order on circular welded pipe from Thailand. 101 F.4th at 1319 (Fed. Cir.

2024). Commerce ultimately determined that the order covered dual-stenciled pipe

but not line pipe, and the Federal Circuit upheld this decision. *Id.* Notably, the

scope inquiry was not concerned with "particular" pieces of pipe with specific

diameters, lengths, and wall thicknesses. *See id.* Rather, the only relevant physical characteristic at issue in the scope inquiry was the fact that the pipe was dual-stenciled as meeting the specifications for both standard pipe and line pipe. *Id.*

Nor is there any merit to Plaintiffs' suggestion that the relevant physical characteristic in a scope inquiry cannot be a "production cycle" that takes place in a third country. *See* Pls. Br. at 28. The courts' decision in *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ("*Bell Supply VI*") completely dispels this suggestion. In *Bell Supply*, Commerce ruled that unfinished oil country tubular goods ("OCTG") originating in China and finished in Indonesia fell within the scope of the orders on OCTG from China because the OCTG did not undergo substantial transformation in Indonesia. *Id.* After a lengthy history, the Federal Circuit held that, where the relevant characteristic in a scope inquiry is a production scenario involving third-country processing, Commerce may use a substantial transformation analysis to determine the country of origin for the further processed merchandise. *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) ("*Bell Supply V*"). The Federal Circuit explained that "{b}ecause a single article can be assembled from various components and undergo multiple finishing steps, Commerce must have some way to determine the country of origin during scope inquiries." *Id.* Ultimately, after multiple remands, Commerce's scope determination was affirmed as being supported by substantial evidence and in accordance with law. *Bell Supply V*, 393 F. Supp. 3d at 1244.

19

The scope inquiry in this case is similar in all relevant aspects to the scope inquiry at issue in *Bell Supply*. Both inquiries focused on whether certain unfinished merchandise from China that undergoes further processing in third countries is subject to the AD/CVD orders on merchandise from China. Moreover, in both inquiries, Commerce applied a substantial transformation analysis to determine whether the third country processing resulted in a different country of origin that removed the finished merchandise from the scope of the orders on merchandise from China. The Federal Circuit and CIT upheld the scope inquiry in *Bell Supply*. It should also be upheld in the instant case.

It is preposterous for Plaintiffs to argue that "the third-country processing scenarios set forth in the initial and subsequent supplemental responses provided no detail or foundation to understand which processing was subject to the inquiry." Pls. Br. at 39. As Commerce found, the AKCA provided the following distinct production phases that detailed the production phases in China and the processing that took place in the third countries:

| Phase | Description |
|-------|-------------|
| **1(a)** | The initial stage of production involves the collection and preparation of raw wood and sheets of wood products which are intended as the predominant composition of a wooden cabinet. The raw wood is then cut to shape using a variety of wood cutting and forming machinery to form the outer faces, interior drawers, backings, cabinet frames, door frames, drawer faces, and any other component or component part that, when assembled, constitutes a completed cabinet. Aside from the forming of wooden components and component parts into the proper size and shape, components and component parts may be drilled, notched, punched or otherwise processed, where required. |

| | |
|---|---|
| **1(b)** | Sub-Phase 1(b) of production involves assembling the component parts of the door, drawer face, and frame (e.g., rails, stiles, panels). This subphase does not apply to the cabinet box (e.g., top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and the drawer box (e.g., sides backs, bottoms). These component parts are packaged and shipped in an unassembled form and are assembled after importation into the United States. |
| **2** | Phase 2 of production is where the components and component parts are painted, stained, coated, or overlaid with other components or coverings, yielding a finished component. The inputs here include primer, paints and stains, clear coat protective lacquers, enamels, glazing materials, vinyl, or other plastic overlay materials. At this stage, mounting and assembly hardware and components, such as hinges, screws, dowels, cams, and slides may be attached to the cabinet components. Drawer boxes are typically coated with a clear finish. |
| **3** | Phase 3 of production is where the finished components and component parts are arranged in a ready-to-assemble ("RTA") flack pack box or bulk packed on pallets as components for exportation to the United States. |

Commerce Post-Preliminary Analysis Memo (Sept. 28, 2023) (Appx4953-4961) at 4-5. The AKCA also described in detail where each phase of production takes place for all four scenarios and for each component at issue in the requested scope inquiries. *See* AKCA New Factual Information (Apr. 13, 2023) (Appx4572-4640) at 4-5 For example, for Scenario 1, the production processes took place as follows:

| Phase | Doors | Drawer Fronts | Frame | Drawer Box | Cabinet Box (including toe kick) |
|-------|-------|---------------|-------|------------|----------------------------------|
| 1(a) | China | China | China | Malaysia/ Vietnam | Malaysia/ Vietnam |
| 1(b) | China | China | China | N/A | N/A |
| 2 | China | China | China | N/A | Malaysia/ Vietnam |
| 3 | Malaysia/ Vietnam | Malaysia/ Vietnam | Malaysia/ Vietnam | Malaysia/ Vietnam | Malaysia/ Vietnam |

*Id.* Thus, the AKCA provided an excruciating level of specificity and detail with respect to which processing was subject to the inquiry.

Significantly, Commerce's regulations request information "to the extent reasonably available to the applicant" because, as a practical matter, "interested parties requesting a scope ruling may not have access to all the information that is listed" and "it is a fact that domestic industries will likely have less information about a particular exporter and its production experience, for example, than the producer, exporter, and possibly importer of that product." *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,315 (Dep't Commerce Sept. 20, 2021) ("*2021 Regulation Improvements*"). Commerce adopted a flexible standard that understands access to certain information, like specific details on a foreign manufacturer's production process, might be limited for domestic interested parties such as the AKCA. The AKCA submitted reasonably available information on the production process in accordance with the regulation. That is all that was required.

22

Commerce correctly rejected arguments from respondents that complained about the sufficiency of the information in the AKCA's scope ruling requests and stated that it is "cognizant of the asymmetries of available information to different types of interested parties and understand{s} that parties other than the foreign manufacturers do not usually have access to all foreign production data." Malay. Prelim. (Appx3935-3986) at 39. It is for this reason that the AKCA did not have access to tangible evidence that shows specific companies in Vietnam and Malaysia producing the inquiry merchandise. Demanding more would essentially foreclose domestic interested parties like the AKCA from obtaining any scope ruling on merchandise that significantly undermines the relief to which they are entitled. Commerce thus correctly rejected Plaintiffs' arguments relating to an alleged deficiency with the information provided by AKCA on the production of inquiry merchandise.

Plaintiffs' reliance on the Court's decision in *Fabuwood* is unavailing. Pls. Br. at 38. As an initial matter, a different version of the scope regulation applied to the scope proceeding in *Fabuwood* as compared to the scope regulation that applies to these scope inquiries. The current regulation, which went into effect in 2021 and applies to these scope inquiries, requires interested parties to submit a standardized scope ruling application that is designed to gather the necessary information and address the concern that scope ruling requests in the past were not sufficiently detailed. *See 2021 Regulation Improvements*, 86 Fed. Reg. at 52,313

23

(explaining that Commerce is "now requiring an application, with specific information required in that application, as a result of various concerns, including the fact that scope ruling requests do not always include the requisite sufficient description and supporting information necessary for Commerce to complete an analysis") (internal quotation and citation omitted).

Additionally, the court in *Fabuwood* explicitly stated that it did not need to decide whether the scope ruling request was deficient because Commerce did not adequately address challenges to the sufficiency of the request in the final scope ruling. *See Fabuwood*, 469 F. Supp. 3d at 1383 ("The court need not decide whether the Amended Scope Ruling Request was deficient because Commerce did not adequately address this issue."). The Court faulted Commerce for cursorily concluding, without explaining, that the scope ruling request provided all requisite information reasonably available and provided a sufficient description of the products at issue. *Id.* at 1383–1384. The analytical flaw the court identified in *Fabuwood* is not present in this case, because Commerce's scope determinations dedicated an entire comment to respond to arguments that Commerce improperly initiated these scope inquiries based on allegedly deficient scope requests. MY Ruling (Appx5305-5346) at Comment 1. Moreover, in *Fabuwood,* although Commerce determined on remand that the scope request was deficient in certain respects, the requestor itself had conceded that it had additional reasonably available information which it did not supply. *See Fabuwood Cabinetry Corp. v.*

24

*United States*, 519 F. Supp. 3d 1335, 1339 (Ct. Int'l Trade 2021). Here, in contrast, the AKCA submitted all information reasonably available to it when it provided the information requested in the scope ruling applications. Thus, unlike the scope request at issue in *Fabuwood*, the AKCA's scope ruling requests provided a proper basis for Commerce to initiate the underlying scope inquiries.

The bottom line is the AKCA's scope ruling applications complied with Commerce's regulations by providing detailed information that was adequate for Commerce to initiate the underlying scope inquiries. Commerce thus properly initiated the underlying scope inquiries.

## II.  Commerce Properly Determined that Semifinished WCV Components Are Covered by the Scope of the Orders

Commerce found that the semifinished wooden cabinet components produced in China in Scenarios 1, 2, 3, and 4 were subject to the Orders when they were exported from China for further processing in Malaysia and Vietnam. MY Ruling (Appx5305-5346) at Comment 2. This is why Commerce found that it was necessary to conduct a substantial transformation analysis to determine the country of origin of the third country wooden cabinets produced using the four scenarios. *Id.* Commerce explained that the scope specifically addresses in-scope components that may undergo processing in a third country and thus plainly covers semifinished components. *Id.*

25

The Court should reject Plaintiffs' argument that "{a}n analysis of the plain language of the scope of the Orders at issue here makes it clear that 'semifinished components' are not covered by the language of the scope and the scope cannot be reasonably interpreted to include it." Pls. Br. at 35. Plaintiffs ground this argument in the fact that the scope does not use the exact phrase "semifinished components." *Id.* As discussed below, Commerce properly found in the final scope determinations that semifinished components are covered by the scope of the Orders at the time they are exported from China to Vietnam or Malaysia.

A plain reading of the scope shows that semifinished components are covered by the Orders. The first relevant section is the opening language of the scope, which reads as follows:

> Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, ***whether or not surface finished or unfinished***, and ***whether or not completed***.

Orders, 85 Fed. Reg. at 22,126. The language highlighted above states clearly and plainly that the scope covers WCV regardless of whether they are surface finished or unfinished and regardless of whether or not completed. Thus, WCV components made in China are covered by the scope even if they are unfinished and not completed.

The second relevant section is the scope language that addresses WCV that are processed in a third country:

26

> Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the in-scope product.

*Id.* This scope language states that any processing that is required to take semifinished components made in China and finish them in a third country does not remove the product from the scope's coverage. Thus, semifinished components exported from China that are finished in a third country are covered by the scope. This language has meaning only if the scope already includes semifinished components produced in China. A reading of the scope that excludes semifinished components from China would impermissibly render the language in the third-country processing paragraph superfluous.

The description of the merchandise contained in the AKCA's petition also supports a reading that the scope includes semifinished merchandise:

> The merchandise subject to these investigations consists of wood-constructed products serving the purpose and function of permanently affixed cabinetry typically found throughout the home, including kitchen and bath cabinetry, modular vanities, pedestal vanities (which may or may not include a top composed of stone, plastic or other material), ***whether finished or unfinished, and wooden parts and components thereof***.

AKCA Malaysia Scope Application (Apr. 22, 2022) (Appx1001-1879) at Attachment 1, Exhibit 3, p.7. Accordingly, the plain language of the scope and the petition (a primary interpretive source under 19 C.F.R. § 351.225(k)(1)) support the AKCA's

understanding that the Orders cover finished, semifinished, and unfinished cabinet components.

Commerce's decision in the new shipper review of Dalian Hualing Wood Co., Ltd. ("Hualing") further supports this interpretation of the scope language. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Rescission of Antidumping Duty New Shipper Review; 2020*, 86 Fed. Reg. 62,788 (Dep't Commerce Nov. 12, 2021) and accompanying Issues and Decision Memorandum. In that review, Hualing argued that it qualified as a "new shipper" because the merchandise it previously shipped to the United States during the period of investigation was not subject merchandise. *Id.* at 6. Specifically, Hualing claimed that it previously shipped "wooden boards" that would need to be sawn before they could be incorporated into complete cabinets. *Id.* However, the evidence showed that these so-called wooden boards were actually "birch drawer sides" — *i.e.,* unfinished WCV components. *Id.* at 5. Commerce concluded that Hualing did not qualify as a new shipper and rescinded the review because the scope includes the unfinished drawer component parts that Hualing shipped to the United States during the period of investigation. *Id.* at 6. Commerce's decision to rescind the new shipper review on this basis demonstrates that Commerce has always considered semifinished WCV components to be covered by the scope of the Orders.

Plaintiffs note that the scope clarifies that only "in-scope components" that are exported and further processed in a third country remain in scope if the further

processing would not have removed the merchandise from the scope of the order if performed in the country of origin. Pls. Br. at 35. They argue that, in its final scope ruling, "Commerce determined that products that would not be considered in-scope upon exportation would be rendered in-scope after further manufacturing." *Id.* at 36. This argument misses the point and is based entirely on an incorrect understanding of the scope of merchandise covered by the Orders. The unfinished components are covered by the scope at the time that they are exported from China and imported into the third country.

Taking the merchandise in Scenario 2 as an example, the components are unfinished because they have not yet undergone any surface finishing. However, the scope specifically contemplates that "in-scope" components made in China may undergo "painting" or "staining" or other "finishing" in a third country before being exported to the United States. In other words, the scope specifically contemplates that components exported from China that are not yet surface finished (*i.e.,* painted or stained) are "in-scope components." This interpretation is also supported by the model match criteria that Commerce employed in the AD investigation. Field 3.7 of the criteria states that respondents must report the "surface coatings and/or finishings that have been imparted to the face frame and/or doors or drawers." AKCA Post-Initiation Rebuttal Comments and RFI (July, 28, 2022) (Appx3536-3827) at Exhibit 3a. The first field for this criterion is "00 = None – bare surface."

*Id.* Once again, this shows that unfinished face frames, doors, and drawers that are exported from China are already "in-scope components" when they leave China.

Plaintiffs contend that the scope ruling must be reversed because Commerce failed to consider the (k)(1) factors in its analysis. Pls. Br. at 35-36. This contention is devoid of merit. First, because the plain language of the scope makes it clear that semifinished components are covered, there was no need to resort to the (k)(1) factors. *Saha Thai*, 101 F.4th at 1323 ("If the scope language expressly and dispositively resolves whether the subject merchandise falls within or outside of the scope, the scope analysis comes to an end."); *see also SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263, 1272 (Ct. Int'l Trade 2023). Second, to the extent there is a need to examine the (k)(1) factors, Plaintiffs fail to point to a single (k)(1) source that supports their proffered interpretation of the scope. Third, both the AKCA's petition and Commerce's prior ruling on Hualing's semifinished components, which are both (k)(1) sources, support the interpretation that the scope covers semifinished components.

In sum, Commerce correctly found below that semifinished components originating in China are covered by the scope of the Orders.

## III. Commerce's Substantial Transformation Analysis Is Supported by Substantial Evidence

In the final scope rulings Commerce examined each of the seven prongs of the substantial transformation analysis to determine that products under Scenarios 1,

2, and 3, are covered by the scope of the Orders. Plaintiffs challenge the sufficiency of the record evidence in support of this analysis. Pls. Br. at 42-43. They argue that Commerce's analysis is not supported by substantial evidence because it lacks "critical data such as actual cost details" and "investment specifics." *Id.* As demonstrated below, nothing could be further from the truth.

After Commerce's preliminary scope determination, the AKCA submitted cost information from [                              ], a [            ] wooden cabinets producer, and Wellborn Cabinet Inc. ("Wellborn"), a U.S. wooden cabinets producer. AKCA New Factual Information (Apr. 13, 2023) (Appx4572-4640; Appx82642-82711). Commerce conducted extremely detailed cost calculations using this information for Scenarios 1, 2, and 3. *See* Commerce Post-Preliminary Analysis (Sept. 28, 2023) (Appx4953-4961) at 2 and Attachment. Commerce's calculation workbook contains four tabs associated with the analysis of scenarios 1, 2, and 3 including: "Cost Buildup Scenarios 1, 2, 3," "NFI Data," "Phases & Outcomes," and "Essential Characteristic." *Id.* This detailed analysis allowed Commerce to compare the cost of production and value added in China and the third countries for each scenario. For illustrative purposes, below are the results of this analysis for Scenario 1:

> For scenario 1, the cost of production is the most significant in phase 1(a) (*i.e.*, [      ] USD), while phases 1(b), 2, and 3 are less costly (*i.e.*, [      ] USD, [      ] USD and [      ] USD, respectively). In scenario 1, for production of doors, drawer fronts, and frame components in phases 1(a), 1(b), and 2, occurs in China, while all phases of production for

> cabinet boxes and drawer boxes occur in the third country, and all phase 3 processes, for all components, occur in the third country. Therefore, most of the cost of production occurs in China and only 29.9 percent of cost of production takes place in the third country in scenario 1.

Commerce Post-Preliminary Scope Decision (Sept. 29, 2023) (Appx4934-4949; Appx82960-82966) at 5. Commerce reached similar results after conducting the same analysis for Scenarios 2 and 3. Far from lacking cost details, Commerce's analysis was extremely detailed and sophisticated.

The same is also true for Commerce's analysis of the investment involved in the third countries. Commerce relied on information from [        ] to measure the investment involved in each of the production phases by required equipment value, factory space, and the number of workers. *Id.* at 9. Below are the results of Commerce's analysis just for equipment value for Scenario 1:

> For scenario 1, phase 1(a) production requires [        ] USD of equipment, phase 2 production requires [        ] USD of equipment, phase 1(b) requires [        ] USD of equipment, and phase 3 requires no equipment. In scenario 1 production of doors, drawer fronts, and frame components in phases 1(a), 1(b), and 2, occurs in China, while all production phases involving cabinet boxes and drawer boxes occur in the third country as well as all phase 3 processes for all components. Phase 1(a) requires the [     ] equipment value because the wooden parts are formed by cutting, drilling, *etc.* The outcome of this analysis indicates that 40 percent of the total equipment value was required in the third country under scenario 1.

*Id.* Moreover, this analysis was based on specific investments that would be required for each piece of equipment in a cabinets factory (*e.g.*, saws, drills, paint drying racks, forklifts, *etc.*) to complete each phase of production. *See* Commerce

32

Post-Preliminary Analysis (Sept. 28, 2023) (Appx82960-82966) at 5. It is thus preposterous for the Plaintiffs to assert that the record lacked "investment specifics."

There is also no basis for Plaintiffs' claim that "Commerce unreasonably relied on the intended use of the finished products." Pls. Br. at 44, 49. Commerce found that the intended end-use of the downstream product (*i.e.*, complete wooden cabinets) does not change from when a company first produced the component in China until the packaging of the finished wooden cabinet in the third country. MY Ruling (Appx5305-5346) at 14-15. Commerce determined that this factor supports finding China as the country of origin for all scenarios, because in each instance third country processing did not alter the physical characteristics of the complete wooden cabinet beyond subject merchandise. *Id.* Plaintiffs argue that "the upstream products could have a different intended end-use, that is, being incorporated into a cabinet that does not function as permanently installed cabinetry and instead being incorporated into a free-standing piece of furniture, such as living room display cabinets, television cabinets, buffets and sideboards, sauce and soda stations." Pls. Br. at 49-50. As Commerce explained in the final scope rulings, however, the scope inquiries only covered WCV for permanent installation, and Commerce was thus not ruling on any scenario involving the use of wooden cabinet components to produce free-standing wooden cabinets. MY Ruling (Appx5305-5346) at 15. There is thus no question that, for the scenario merchandise that was at issue in these scope

33

inquiries, the intended end-use of the upstream unfinished products is for cabinets for permanent installation. To the extent any Malaysian and Vietnamese companies import Chinese-origin components and incorporate them into freestanding furniture, Commerce's scope inquiries will have no impact on these companies, because the freestanding furniture that they export is not covered by the scope of the Orders. Commerce thus correctly found that the intended end-use of the components supports a determination that substantial transformation does not take place in the third countries.

Plaintiffs next claim Commerce adopted an approach that "improperly prioritizes a single factor." Pls. Br. at 44. Plaintiffs allege that "Commerce unreasonably overrode {other} factors in favor of an analysis focused almost exclusively on end use and essential components." *Id.* at 36. There is simply no basis for this claim. First, Commerce clearly stated that "{t}here were seven factors examined in the substantial transformation analysis" and "all seven prongs of the analysis were weighted equally." MY Ruling (Appx5305-5346) at 24. Second, to the extent Plaintiffs believe Commerce incorrectly weighed the factors, they seem to be confused in how the factors cut in the analysis. Specifically, Plaintiffs state that "Commerce determined that only *three* of the seven prongs support a determination that substantial transformation in Scenario 3 (sic), however, Commerce continued to determine that substantial transformation occurred in the third country." Pls. Br. at 47 (emphasis in original). This is just wrong. Commerce actually found for

34

scenario 3 that "*four* of the seven factors … indicate that substantial transformation did not occur in the third country." MY Ruling (Appx5305-5346) at 24 (emphasis added). Commerce thus found that substantial transformation did *not* occur. Third, to the extent Plaintiffs are asking the Court to reweigh the factors and arrive at a different conclusion than Commerce, that is not the role of judicial review. *Shanghai Tainai Bearing Co. v. United States*, 658 F. Supp. 3d 1269, 1291 (Ct. Int'l Trade 2023) ("Yet, this Court may not reweigh the evidence and substitute its judgment for Commerce's."). There is thus no basis to remand the scope rulings based on how Commerce weighed the relevant regulatory factors.

Finally, Plaintiffs attempt to nitpick various aspects of the Wellborn cost data that Commerce used to conduct its substantial transformation analysis. *See* Pls. Br. at 47. In the final scope rulings, however, Commerce addressed each and every alleged deficiency with the Wellborn cost data noted by the interested parties, including the specific product used for the cost buildup, supposed differences between the Chinese cabinets and Wellborn's cabinets, the byproduct rates in Wellborn's cost buildup, the currency denomination in which the costs for minor inputs such as glue, staples, and abrasives were stated, alleged inaccuracies in the cost buildup for phase 3 of the production process, and the lack of documents reconciling Wellborn's reported costs to its audited financial statements. MY Ruling (Appx5305-5346) at 16-18. Although Commerce adequately addressed each of these

alleged deficiencies in its final scope ruling, Plaintiffs say nothing about how they were addressed but instead simply reassert the same deficiencies.

Wellborn's and [        ] cost data was the only cost data on the record, because Plaintiffs squandered their opportunity to submit alternative cost data to assist Commerce in conducting its substantial transformation analysis. Moreover, after the AKCA submitted this cost data, the respondents had fully 18 days (from April 13, 2023 to May 1, 2023) to identify any distortions, inaccuracies, or other problems in the cost data submitted by the AKCA and submit rebuttal factual information to expose any such problems. *See* Letter from Commerce re: Response to Request to Extend the New Factual Information Rebuttal and Comment Deadlines (Apr. 24, 2023) (Appx4545-4549). Apparently, Plaintiffs and the other respondents were unable to identify any actual evidence to substantiate the deficiencies that they later raised, because they did not submit any factual information to rebut, clarify, or correct the AKCA's submitted cost data.

In sum, Commerce's substantial transformation analysis was fully supported by the record evidence. Plaintiffs' claims to the contrary are utterly without merit.

## IV.    The Certification Requirements Imposed by Commerce Are Lawful

In the final scope rulings, Commerce decided it would impose a certification requirement applicable to all third-country exporters (and their U.S. importers) to ensure that AD/CVD duties under the Orders are properly applied to Chinese-origin goods that undergo third-country processing in Malaysia and Vietnam in a manner

consistent with production scenarios 1, 2, and 3. Plaintiffs' arguments that
Commerce lacked the authority to impose these certification requirements should be
rejected.

The Federal Circuit has held that "Commerce is entitled to substantial
deference with regard to its interpretations of its own antidumping {and
countervailing} duty orders{,}" and that Commerce is "entitled to deference with
regard to scope issues because of its expertise in this area." *King Supply Co., LLC v.
United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (quoting *Sandvik*, 164 F.3d at
600). In this regard, Commerce's regulations expressly provide under 19 C.F.R. §
351.228 that Commerce may establish certification requirements in the context of
an AD/CVD proceeding. When Commerce introduced this regulatory provision, it
explained that it "determined that the establishment of a certification scheme is
necessary to ensure the enforcement of AD/CVD orders or suspension agreements."
*2021 Regulation Improvements*, 85 Fed. Reg. at 49491.

Commerce has imposed certification regimes in prior scope inquiries where
the final scope rulings have been made on a country-wide basis. *See, e.g., Glycine
From the People's Republic of China: Final Partial Affirmative Determination of
Circumvention of the Antidumping Duty Order,*77 Fed. Reg. 73,426 (Dep't
Commerce Dec 10, 2012) and accompanying Issues and Decision Memorandum at
Issue 2 ("{T}he Department has issued an affirmative scope ruling in which it finds
that glycine processed in India of Chinese origin does not change country of origin.

37

As part of the affirmative scope ruling, the Department has instituted a certification procedure, which it believes further addresses the issue of affiliates.") (citing Final Scope Ruling Concerning the Antidumping Duty Order on Glycine from the People's Republic of China (Dec. 3, 2012)); *Certain Quartz Surface Products From the People's Republic of China: Final Scope Ruling on Malaysian Processed Quartz Slab and Recission of the Circumvention Inquiry*, 87 Fed. Reg. 64,009 (Dep't Commerce Oct. 21, 2022) ("*QSP Malaysia Processed*"). For example, this is the approach that Commerce took in the scope inquiries involving quartz surface products from China that were further processed in Malaysia. *QSP Malaysia Processed*, 87 Fed. Reg. at 64,009. Commerce found that companies which fully participated in the scope inquiry had not used Chinese quartz slab as an input in the production of Malaysian quartz surface products. *Id.* However, certain companies failed to respond to Commerce's requests for information. *Id.* Therefore, pursuant to 19 C.F.R. § 351.228, Commerce implemented a certification requirement for all imports of quartz surface products from Malaysia. *Id.* A certification requirement was necessary to administer the country-wide finding and ensure that AD/CVD duties were properly assessed on entries of in-scope merchandise of Malaysian origin while also allowing out-of-scope merchandise produced from quartz that did not originate in China to enter the United States without being subject to suspension of liquidation and cash deposit requirements. *Id.*

In sum, Commerce's implementation of a certification requirement was consistent with its authority to administer and enforce its AD/CVD orders, authorized by its regulations, and consistent with its practice in prior proceedings.

## CONCLUSION

For the foregoing reasons, the AKCA respectfully requests that the Court reject Plaintiffs' arguments and affirm Commerce's final scope rulings.

Respectfully submitted,

/s/ Luke A. Meisner
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for the American Kitchen Cabinet Alliance*

Dated: June 6, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing response brief complies with the Court's order of December 11, 2024 (ECF No. 23), limiting defendant-intervenor's response brief to 14,000 words. This response brief contains 9,184 words (including text, quotations, footnotes, headings, and attachments) according to the word count function of the word processing software used to prepare the brief.

Respectfully submitted,

/s/ Luke A. Meisner
Luke A. Meisner, Esq.

Dated: June 6, 2025